# BOWERS, ATTORNEY GENERAL OF GEORGIA
## *v.* HARDWICK ET AL.

No. 85–140.   Argued March 31, 1986—Decided June 30, 1986

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BURGER, C. J., post, p. 196, and POWELL, J., post, p. 197, filed concurring opinions. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, post, p. 199. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, post, p. 214.

*Michael E. Hobbs*, Senior Assistant Attorney General of Georgia, argued the cause for petitioner. With him on the briefs were *Michael J. Bowers*, Attorney General, *pro se*, *Marion O. Gordon*, First Assistant Attorney General, and *Daryl A. Robinson*, Senior Assistant Attorney General.

*Laurence H. Tribe* argued the cause for respondent Hardwick. With him on the brief were *Kathleen M. Sullivan* and *Kathleen L. Wilde*.*

JUSTICE WHITE delivered the opinion of the Court.

In August 1982, respondent Hardwick (hereafter respondent) was charged with violating the Georgia statute crimi-

---

*Briefs of *amici curiae* urging reversal were filed for the Catholic League for Religious and Civil Rights by *Steven Frederick McDowell;* for the Rutherford Institute et al. by *W. Charles Bundren, Guy O. Farley, Jr., George M. Weaver, William B. Hollberg, Wendell R. Bird, John W. Whitehead, Thomas O. Kotouc*, and *Alfred Lindh;* and for David Robinson, Jr., *pro se.*

Briefs of *amici curiae* urging affirmance were filed for the State of New York et al. by *Robert Abrams*, Attorney General of New York, *Robert Hermann*, Solicitor General, *Lawrence S. Kahn, Howard L. Zwickel, Charles R. Fraser*, and *Sanford M. Cohen*, Assistant Attorneys General, and *John Van de Kamp*, Attorney General of California; for the American Jewish Congress by *Daniel D. Levenson, David Cohen*, and *Frederick Mandel;* for the American Psychological Association et al. by *Margaret Farrell Ewing, Donald N. Bersoff, Anne Simon, Nadine Taub*, and *Herbert Semmel;* for the Association of the Bar of the City of New York by *Steven A. Rosen;* for the National Organization for Women by *John S. L. Katz;* and for the Presbyterian Church (U. S. A.) et al. by *Jeffrey O. Bramlett.*

Briefs of *amici curiae* were filed for the Lesbian Rights Project et al. by *Mary C. Dunlap;* and for the National Gay Rights Advocates et al. by *Edward P. Errante, Leonard Graff*, and *Jay Kohorn.*

nalizing sodomy[1] by committing that act with another adult male in the bedroom of respondent's home. After a preliminary hearing, the District Attorney decided not to present the matter to the grand jury unless further evidence developed.

Respondent then brought suit in the Federal District Court, challenging the constitutionality of the statute insofar as it criminalized consensual sodomy.[2] He asserted that he was a practicing homosexual, that the Georgia sodomy statute, as administered by the defendants, placed him in imminent danger of arrest, and that the statute for several reasons violates the Federal Constitution. The District Court granted the defendants' motion to dismiss for failure to state a claim, relying on *Doe* v. *Commonwealth's Attorney for the City of Richmond*, 403 F. Supp. 1199 (ED Va. 1975), which this Court summarily affirmed, 425 U. S. 901 (1976).

---

[1] Georgia Code Ann. § 16–6–2 (1984) provides, in pertinent part, as follows:

"(a) A person commits the offense of sodomy when he performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another. . . .

"(b) A person convicted of the offense of sodomy shall be punished by imprisonment for not less than one nor more than 20 years. . . ."

[2] John and Mary Doe were also plaintiffs in the action. They alleged that they wished to engage in sexual activity proscribed by § 16–6–2 in the privacy of their home, App. 3, and that they had been "chilled and deterred" from engaging in such activity by both the existence of the statute and Hardwick's arrest. *Id.*, at 5. The District Court held, however, that because they had neither sustained, nor were in immediate danger of sustaining, any direct injury from the enforcement of the statute, they did not have proper standing to maintain the action. *Id.*, at 18. The Court of Appeals affirmed the District Court's judgment dismissing the Does' claim for lack of standing, 760 F. 2d 1202, 1206–1207 (CA11 1985), and the Does do not challenge that holding in this Court.

The only claim properly before the Court, therefore, is Hardwick's challenge to the Georgia statute as applied to consensual homosexual sodomy. We express no opinion on the constitutionality of the Georgia statute as applied to other acts of sodomy.

A divided panel of the Court of Appeals for the Eleventh Circuit reversed. 760 F. 2d 1202 (1985). The court first held that, because *Doe* was distinguishable and in any event had been undermined by later decisions, our summary affirmance in that case did not require affirmance of the District Court. Relying on our decisions in *Griswold* v. *Connecticut*, 381 U. S. 479 (1965); *Eisenstadt* v. *Baird*, 405 U. S. 438 (1972); *Stanley* v. *Georgia*, 394 U. S. 557 (1969); and *Roe* v. *Wade*, 410 U. S. 113 (1973), the court went on to hold that the Georgia statute violated respondent's fundamental rights because his homosexual activity is a private and intimate association that is beyond the reach of state regulation by reason of the Ninth Amendment and the Due Process Clause of the Fourteenth Amendment. The case was remanded for trial, at which, to prevail, the State would have to prove that the statute is supported by a compelling interest and is the most narrowly drawn means of achieving that end.

Because other Courts of Appeals have arrived at judgments contrary to that of the Eleventh Circuit in this case,[3] we granted the Attorney General's petition for certiorari questioning the holding that the sodomy statute violates the fundamental rights of homosexuals. We agree with petitioner that the Court of Appeals erred, and hence reverse its judgment.[4]

---

[3] See *Baker* v. *Wade*, 769 F. 2d 289, rehearing denied, 774 F. 2d 1285 (CA5 1985) (en banc); *Dronenburg* v. *Zech*, 239 U. S. App. D. C. 229, 741 F. 2d 1388, rehearing denied, 241 U. S. App. D. C. 262, 746 F. 2d 1579 (1984).

[4] Petitioner also submits that the Court of Appeals erred in holding that the District Court was not obligated to follow our summary affirmance in *Doe*. We need not resolve this dispute, for we prefer to give plenary consideration to the merits of this case rather than rely on our earlier action in *Doe*. See *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 14 (1976); *Massachusetts Board of Retirement* v. *Murgia*, 427 U. S. 307, 309, n. 1 (1976); *Edelman* v. *Jordan*, 415 U. S. 651, 671 (1974). Cf. *Hicks* v. *Miranda*, 422 U. S. 332, 344 (1975).

This case does not require a judgment on whether laws against sodomy between consenting adults in general, or between homosexuals in particular, are wise or desirable. It raises no question about the right or propriety of state legislative decisions to repeal their laws that criminalize homosexual sodomy, or of state-court decisions invalidating those laws on state constitutional grounds. The issue presented is whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy and hence invalidates the laws of the many States that still make such conduct illegal and have done so for a very long time. The case also calls for some judgment about the limits of the Court's role in carrying out its constitutional mandate.

We first register our disagreement with the Court of Appeals and with respondent that the Court's prior cases have construed the Constitution to confer a right of privacy that extends to homosexual sodomy and for all intents and purposes have decided this case. The reach of this line of cases was sketched in *Carey* v. *Population Services International,* 431 U. S. 678, 685 (1977). *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925), and *Meyer* v. *Nebraska,* 262 U. S. 390 (1923), were described as dealing with child rearing and education; *Prince* v. *Massachusetts,* 321 U. S. 158 (1944), with family relationships; *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535 (1942), with procreation; *Loving* v. *Virginia,* 388 U. S. 1 (1967), with marriage; *Griswold* v. *Connecticut, supra,* and *Eisenstadt* v. *Baird, supra,* with contraception; and *Roe* v. *Wade,* 410 U. S. 113 (1973), with abortion. The latter three cases were interpreted as construing the Due Process Clause of the Fourteenth Amendment to confer a fundamental individual right to decide whether or not to beget or bear a child. *Carey* v. *Population Services International, supra,* at 688–689.

Accepting the decisions in these cases and the above description of them, we think it evident that none of the rights announced in those cases bears any resemblance to the

claimed constitutional right of homosexuals to engage in acts of sodomy that is asserted in this case. No connection between family, marriage, or procreation on the one hand and homosexual activity on the other has been demonstrated, either by the Court of Appeals or by respondent. Moreover, any claim that these cases nevertheless stand for the proposition that any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription is unsupportable. Indeed, the Court's opinion in *Carey* twice asserted that the privacy right, which the *Griswold* line of cases found to be one of the protections provided by the Due Process Clause, did not reach so far. 431 U. S., at 688, n. 5, 694, n. 17.

Precedent aside, however, respondent would have us announce, as the Court of Appeals did, a fundamental right to engage in homosexual sodomy. This we are quite unwilling to do. It is true that despite the language of the Due Process Clauses of the Fifth and Fourteenth Amendments, which appears to focus only on the processes by which life, liberty, or property is taken, the cases are legion in which those Clauses have been interpreted to have substantive content, subsuming rights that to a great extent are immune from federal or state regulation or proscription. Among such cases are those recognizing rights that have little or no textual support in the constitutional language. *Meyer*, *Prince*, and *Pierce* fall in this category, as do the privacy cases from *Griswold* to *Carey*.

Striving to assure itself and the public that announcing rights not readily identifiable in the Constitution's text involves much more than the imposition of the Justices' own choice of values on the States and the Federal Government, the Court has sought to identify the nature of the rights qualifying for heightened judicial protection. In *Palko* v. *Connecticut*, 302 U. S. 319, 325, 326 (1937), it was said that this category includes those fundamental liberties that are "implicit in the concept of ordered liberty," such that "neither

liberty nor justice would exist if [they] were sacrificed." A different description of fundamental liberties appeared in *Moore* v. *East Cleveland*, 431 U. S. 494, 503 (1977) (opinion of POWELL, J.), where they are characterized as those liberties that are "deeply rooted in this Nation's history and tradition." *Id.*, at 503 (POWELL, J.). See also *Griswold* v. *Connecticut*, 381 U. S., at 506.

It is obvious to us that neither of these formulations would extend a fundamental right to homosexuals to engage in acts of consensual sodomy. Proscriptions against that conduct have ancient roots. See generally Survey on the Constitutional Right to Privacy in the Context of Homosexual Activity, 40 U. Miami L. Rev. 521, 525 (1986). Sodomy was a criminal offense at common law and was forbidden by the laws of the original 13 States when they ratified the Bill of Rights.[5] In 1868, when the Fourteenth Amendment was

---

[5] Criminal sodomy laws in effect in 1791:

Connecticut: 1 Public Statute Laws of the State of Connecticut, 1808, Title LXVI, ch. 1, § 2 (rev. 1672).

Delaware: 1 Laws of the State of Delaware, 1797, ch. 22, § 5 (passed 1719).

Georgia had no criminal sodomy statute until 1816, but sodomy was a crime at common law, and the General Assembly adopted the common law of England as the law of Georgia in 1784. The First Laws of the State of Georgia, pt. 1, p. 290 (1981).

Maryland had no criminal sodomy statute in 1791. Maryland's Declaration of Rights, passed in 1776, however, stated that "the inhabitants of Maryland are entitled to the common law of England," and sodomy was a crime at common law. 4 W. Swindler, Sources and Documents of United States Constitutions 372 (1975).

Massachusetts: Acts and Laws passed by the General Court of Massachusetts, ch. 14, Act of Mar. 3, 1785.

New Hampshire passed its first sodomy statute in 1718. Acts and Laws of New Hampshire 1680–1726, p. 141 (1978).

Sodomy was a crime at common law in New Jersey at the time of the ratification of the Bill of Rights. The State enacted its first criminal sodomy law five years later. Acts of the Twentieth General Assembly, Mar. 18, 1796, ch. DC, § 7.

New York: Laws of New York, ch. 21 (passed 1787).

ratified, all but 5 of the 37 States in the Union had criminal sodomy laws.[6]   In fact, until 1961,[7] all 50 States outlawed sodomy, and today, 24 States and the District of Columbia

At the time of ratification of the Bill of Rights, North Carolina had adopted the English statute of Henry VIII outlawing sodomy.   See Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina, ch. 17, p. 314 (Martin ed. 1792).

Pennsylvania: Laws of the Fourteenth General Assembly of the Commonwealth of Pennsylvania, ch. CLIV, § 2 (passed 1790).

Rhode Island passed its first sodomy law in 1662.   The Earliest Acts and Laws of the Colony of Rhode Island and Providence Plantations 1647–1719, p. 142 (1977).

South Carolina: Public Laws of the State of South Carolina, p. 49 (1790).

At the time of the ratification of the Bill of Rights, Virginia had no specific statute outlawing sodomy, but had adopted the English common law. 9 Hening's Laws of Virginia, ch. 5, § 6, p. 127 (1821) (passed 1776).

[6] Criminal sodomy statutes in effect in 1868:

Alabama: Ala. Rev. Code § 3604 (1867).

Arizona (Terr.): Howell Code, ch. 10, § 48 (1865).

Arkansas: Ark. Stat., ch. 51, Art. IV, § 5 (1858).

California: 1 Cal. Gen. Laws, ¶ 1450, § 48 (1865).

Colorado (Terr.): Colo. Rev. Stat., ch. 22, §§ 45, 46 (1868).

Connecticut: Conn. Gen. Stat., Tit. 122, ch. 7, § 124 (1866).

Delaware: Del. Rev. Stat., ch. 131, § 7 (1893).

Florida: Fla. Rev. Stat., div. 5, § 2614 (passed 1868) (1892).

Georgia: Ga. Code §§ 4286, 4287, 4290 (1867).

Kingdom of Hawaii: Haw. Penal Code, ch. 13, § 11 (1869).

Illinois: Ill. Rev. Stat., div. 5, §§ 49, 50 (1845).

Kansas (Terr.): Kan. Stat., ch. 53, § 7 (1855).

Kentucky: 1 Ky. Rev. Stat., ch. 28, Art. IV, § 11 (1860).

Louisiana: La. Rev. Stat., Crimes and Offences, § 5 (1856).

Maine: Me. Rev. Stat., Tit. XII, ch. 160, § 4 (1840).

Maryland: 1 Md. Code, Art. 30, § 201 (1860).

Massachusetts: Mass. Gen. Stat., ch. 165, § 18 (1860).

Michigan: Mich. Rev. Stat., Tit. 30, ch. 158, § 16 (1846).

Minnesota: Minn. Stat., ch. 96, § 13 (1859).

Mississippi: Miss. Rev. Code, ch. 64, § LII, Art. 238 (1857).

Missouri: 1 Mo. Rev. Stat., ch. 50, Art. VIII, § 7 (1856).

Montana (Terr.): Mont. Acts, Resolutions, Memorials, Criminal Practice Acts, ch. IV, § 44 (1866).

Nebraska (Terr.): Neb. Rev. Stat., Crim. Code, ch. 4, § 47 (1866).

continue to provide criminal penalties for sodomy performed in private and between consenting adults. See Survey, U. Miami L. Rev., *supra*, at 524, n. 9. Against this background, to claim that a right to engage in such conduct is "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty" is, at best, facetious.

Nor are we inclined to take a more expansive view of our authority to discover new fundamental rights imbedded in the Due Process Clause. The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution. That this is so was painfully demonstrated by the face-off between the Executive and the Court in the 1930's, which resulted in the repudi-

---

Nevada (Terr.): Nev. Comp. Laws, 1861–1900, Crimes and Punishments, § 45.

New Hampshire: N. H. Laws, Act. of June 19, 1812, § 5 (1815).

New Jersey: N. J. Rev. Stat., Tit. 8, ch. 1, § 9 (1847).

New York: 3 N. Y. Rev. Stat., pt. 4, ch. 1, Tit. 5, § 20 (5th ed. 1859).

North Carolina: N. C. Rev. Code, ch. 34, § 6 (1855).

Oregon: Laws of Ore., Crimes—Against Morality, etc., ch. 7, § 655 (1874).

Pennsylvania: Act of Mar. 31, 1860, § 32, Pub. L. 392, in 1 Digest of Statute Law of Pa. 1700–1903, p. 1011 (Purdon 1905).

Rhode Island: R. I. Gen. Stat., ch. 232, § 12 (1872).

South Carolina: Act of 1712, in 2 Stat. at Large of S. C. 1682–1716, p. 493 (1837).

Tennessee: Tenn. Code, ch. 8, Art. 1, § 4843 (1858).

Texas: Tex. Rev. Stat., Tit. 10, ch. 5, Art. 342 (1887) (passed 1860).

Vermont: Acts and Laws of the State of Vt. (1779).

Virginia: Va. Code, ch. 149, § 12 (1868).

West Virginia: W. Va. Code, ch. 149, § 12 (1868).

Wisconsin (Terr.): Wis. Stat. § 14, p. 367 (1839).

[7] In 1961, Illinois adopted the American Law Institute's Model Penal Code, which decriminalized adult, consensual, private, sexual conduct. Criminal Code of 1961, §§ 11–2, 11–3, 1961 Ill. Laws, pp. 1985, 2006 (codified as amended at Ill. Rev. Stat., ch. 38, ¶¶ 11–2, 11–3 (1983) (repealed 1984)). See American Law Institute, Model Penal Code § 213.2 (Proposed Official Draft 1962).

ation of much of the substantive gloss that the Court had placed on the Due Process Clauses of the Fifth and Fourteenth Amendments. There should be, therefore, great resistance to expand the substantive reach of those Clauses, particularly if it requires redefining the category of rights deemed to be fundamental. Otherwise, the Judiciary necessarily takes to itself further authority to govern the country without express constitutional authority. The claimed right pressed on us today falls far short of overcoming this resistance.

Respondent, however, asserts that the result should be different where the homosexual conduct occurs in the privacy of the home. He relies on *Stanley* v. *Georgia*, 394 U. S. 557 (1969), where the Court held that the First Amendment prevents conviction for possessing and reading obscene material in the privacy of one's home: "If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his house, what books he may read or what films he may watch." *Id.*, at 565.

*Stanley* did protect conduct that would not have been protected outside the home, and it partially prevented the enforcement of state obscenity laws; but the decision was firmly grounded in the First Amendment. The right pressed upon us here has no similar support in the text of the Constitution, and it does not qualify for recognition under the prevailing principles for construing the Fourteenth Amendment. Its limits are also difficult to discern. Plainly enough, otherwise illegal conduct is not always immunized whenever it occurs in the home. Victimless crimes, such as the possession and use of illegal drugs, do not escape the law where they are committed at home. *Stanley* itself recognized that its holding offered no protection for the possession in the home of drugs, firearms, or stolen goods. *Id.*, at 568, n. 11. And if respondent's submission is limited to the voluntary sexual conduct between consenting adults, it would be difficult, except by fiat, to limit the claimed right to homosexual conduct

while leaving exposed to prosecution adultery, incest, and other sexual crimes even though they are committed in the home. We are unwilling to start down that road.

Even if the conduct at issue here is not a fundamental right, respondent asserts that there must be a rational basis for the law and that there is none in this case other than the presumed belief of a majority of the electorate in Georgia that homosexual sodomy is immoral and unacceptable. This is said to be an inadequate rationale to support the law. The law, however, is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed. Even respondent makes no such claim, but insists that majority sentiments about the morality of homosexuality should be declared inadequate. We do not agree, and are unpersuaded that the sodomy laws of some 25 States should be invalidated on this basis.[8]

Accordingly, the judgment of the Court of Appeals is

*Reversed.*

CHIEF JUSTICE BURGER, concurring.

I join the Court's opinion, but I write separately to underscore my view that in constitutional terms there is no such thing as a fundamental right to commit homosexual sodomy.

As the Court notes, *ante,* at 192, the proscriptions against sodomy have very "ancient roots." Decisions of individuals relating to homosexual conduct have been subject to state intervention throughout the history of Western civilization. Condemnation of those practices is firmly rooted in Judeao-Christian moral and ethical standards. Homosexual sodomy was a capital crime under Roman law. See Code Theod. 9.7.6; Code Just. 9.9.31. See also D. Bailey, Homosexuality

---

[8] Respondent does not defend the judgment below based on the Ninth Amendment, the Equal Protection Clause, or the Eighth Amendment.

and the Western Christian Tradition 70–81 (1975). During the English Reformation when powers of the ecclesiastical courts were transferred to the King's Courts, the first English statute criminalizing sodomy was passed. 25 Hen. VIII, ch. 6. Blackstone described "the infamous *crime against nature*" as an offense of "deeper malignity" than rape, a heinous act "the very mention of which is a disgrace to human nature," and "a crime not fit to be named." 4 W. Blackstone, Commentaries *215. The common law of England, including its prohibition of sodomy, became the received law of Georgia and the other Colonies. In 1816 the Georgia Legislature passed the statute at issue here, and that statute has been continuously in force in one form or another since that time. To hold that the act of homosexual sodomy is somehow protected as a fundamental right would be to cast aside millennia of moral teaching.

This is essentially not a question of personal "preferences" but rather of the legislative authority of the State. I find nothing in the Constitution depriving a State of the power to enact the statute challenged here.

JUSTICE POWELL, concurring.

I join the opinion of the Court. I agree with the Court that there is no fundamental right —*i. e.*, no substantive right under the Due Process Clause—such as that claimed by respondent Hardwick, and found to exist by the Court of Appeals. This is not to suggest, however, that respondent may not be protected by the Eighth Amendment of the Constitution. The Georgia statute at issue in this case, Ga. Code Ann. § 16–6–2 (1984), authorizes a court to imprison a person for up to 20 years for a single private, consensual act of sodomy. In my view, a prison sentence for such conduct —certainly a sentence of long duration—would create a serious Eighth Amendment issue. Under the Georgia statute a single act of sodomy, even in the private setting of a home, is a

felony comparable in terms of the possible sentence imposed to serious felonies such as aggravated battery, § 16–5–24, first-degree arson, § 16–7–60, and robbery, § 16–8–40.[1]

In this case, however, respondent has not been tried, much less convicted and sentenced.[2] Moreover, respondent has not raised the Eighth Amendment issue below. For these reasons this constitutional argument is not before us.

---

[1] Among those States that continue to make sodomy a crime, Georgia authorizes one of the longest possible sentences. See Ala. Code § 13A–6–65(a)(3) (1982) (1-year maximum); Ariz. Rev. Stat. Ann. §§ 13–1411, 13–1412 (West Supp. 1985) (30 days); Ark. Stat. Ann. § 41–1813 (1977) (1-year maximum); D. C. Code § 22–3502 (1981) (10-year maximum); Fla. Stat. § 800.02 (1985) (60-day maximum); Ga. Code Ann. § 16–6–2 (1984) (1 to 20 years); Idaho Code § 18–6605 (1979) (5-year minimum); Kan. Stat. Ann. § 21–3505 (Supp. 1985) (6-month maximum); Ky. Rev. Stat. § 510.100 (1985) (90 days to 12 months); La. Rev. Stat. Ann. § 14:89 (West 1986) (5-year maximum); Md. Ann. Code, Art. 27, §§ 553–554 (1982) (10-year maximum); Mich. Comp. Laws § 750.158 (1968) (15-year maximum); Minn. Stat. § 609.293 (1984) (1-year maximum); Miss. Code Ann. § 97–29–59 (1973) (10-year maximum); Mo. Rev. Stat. § 566.090 (Supp. 1984) (1-year maximum); Mont. Code Ann. § 45–5–505 (1985) (10-year maximum); Nev. Rev. Stat. § 201.190 (1985) (6-year maximum); N. C. Gen. Stat. § 14–177 (1981) (10-year maximum); Okla. Stat., Tit. 21, § 886 (1981) (10-year maximum); R. I. Gen. Laws § 11–10–1 (1981) (7 to 20 years); S. C. Code § 16–15–120 (1985) (5-year maximum); Tenn. Code Ann. § 39–2–612 (1982) (5 to 15 years); Tex. Penal Code Ann. § 21.06 (1974) ($200 maximum fine); Utah Code Ann. § 76–5–403 (1978) (6-month maximum); Va. Code § 18.2–361 (1982) (5-year maximum).

[2] It was conceded at oral argument that, prior to the complaint against respondent Hardwick, there had been no reported decision involving prosecution for private homosexual sodomy under this statute for several decades. See *Thompson* v. *Aldredge*, 187 Ga. 467, 200 S. E. 799 (1939). Moreover, the State has declined to present the criminal charge against Hardwick to a grand jury, and this is a suit for declaratory judgment brought by respondents challenging the validity of the statute. The history of nonenforcement suggests the moribund character today of laws criminalizing this type of private, consensual conduct. Some 26 States have repealed similar statutes. But the constitutional validity of the Georgia statute was put in issue by respondents, and for the reasons stated by the Court, I cannot say that conduct condemned for hundreds of years has now become a fundamental right.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUS-TICE MARSHALL, and JUSTICE STEVENS join, dissenting.

This case is no more about "a fundamental right to engage in homosexual sodomy," as the Court purports to declare, *ante*, at 191, than *Stanley* v. *Georgia*, 394 U. S. 557 (1969), was about a fundamental right to watch obscene movies, or *Katz* v. *United States*, 389 U. S. 347 (1967), was about a fundamental right to place interstate bets from a telephone booth. Rather, this case is about "the most comprehensive of rights and the right most valued by civilized men," namely, "the right to be let alone." *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting).

The statute at issue, Ga. Code Ann. § 16–6–2 (1984), denies individuals the right to decide for themselves whether to engage in particular forms of private, consensual sexual activity. The Court concludes that § 16–6–2 is valid essentially because "the laws of . . . many States . . . still make such conduct illegal and have done so for a very long time." *Ante*, at 190. But the fact that the moral judgments expressed by statutes like § 16–6–2 may be "'natural and familiar . . . ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States.'" *Roe* v. *Wade*, 410 U. S. 113, 117 (1973), quoting *Lochner* v. *New York*, 198 U. S. 45, 76 (1905) (Holmes, J., dissenting). Like Justice Holmes, I believe that "[i]t is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897). I believe we must analyze respondent Hardwick's claim in the light of the values that underlie the constitutional right to privacy. If that right means anything, it means that, before Georgia can prosecute its citizens for making choices about the most inti-

mate aspects of their lives, it must do more than assert that the choice they have made is an "'abominable crime not fit to be named among Christians.'" *Herring* v. *State*, 119 Ga. 709, 721, 46 S. E. 876, 882 (1904).

I

In its haste to reverse the Court of Appeals and hold that the Constitution does not "confe[r] a fundamental right upon homosexuals to engage in sodomy," *ante*, at 190, the Court relegates the actual statute being challenged to a footnote and ignores the procedural posture of the case before it. A fair reading of the statute and of the complaint clearly reveals that the majority has distorted the question this case presents.

First, the Court's almost obsessive focus on homosexual activity is particularly hard to justify in light of the broad language Georgia has used. Unlike the Court, the Georgia Legislature has not proceeded on the assumption that homosexuals are so different from other citizens that their lives may be controlled in a way that would not be tolerated if it limited the choices of those other citizens. Cf. *ante*, at 188, n. 2. Rather, Georgia has provided that "[a] person commits the offense of sodomy when he performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another." Ga. Code Ann. § 16–6–2(a) (1984). The sex or status of the persons who engage in the act is irrelevant as a matter of state law. In fact, to the extent I can discern a legislative purpose for Georgia's 1968 enactment of § 16–6–2, that purpose seems to have been to broaden the coverage of the law to reach heterosexual as well as homosexual activity.[1] I therefore see no basis for the

---

[1] Until 1968, Georgia defined sodomy as "the carnal knowledge and connection against the order of nature, by man with man, or in the same unnatural manner with woman." Ga. Crim. Code § 26–5901 (1933). In *Thompson* v. *Aldredge*, 187 Ga. 467, 200 S. E. 799 (1939), the Georgia Supreme Court held that § 26–5901 did not prohibit lesbian activity. And in *Riley* v. *Garrett*, 219 Ga. 345, 133 S. E. 2d 367 (1963), the Georgia

Court's decision to treat this case as an "as applied" challenge to § 16–6–2, see *ante*, at 188, n. 2, or for Georgia's attempt, both in its brief and at oral argument, to defend § 16–6–2 solely on the grounds that it prohibits homosexual activity. Michael Hardwick's standing may rest in significant part on Georgia's apparent willingness to enforce against homosexuals a law it seems not to have any desire to enforce against heterosexuals. See Tr. of Oral Arg. 4–5; cf. 760 F. 2d 1202, 1205–1206 (CA11 1985). But his claim that § 16–6–2 involves an unconstitutional intrusion into his privacy and his right of intimate association does not depend in any way on his sexual orientation.

Second, I disagree with the Court's refusal to consider whether § 16–6–2 runs afoul of the Eighth or Ninth Amendments or the Equal Protection Clause of the Fourteenth Amendment. *Ante*, at 196, n. 8. Respondent's complaint expressly invoked the Ninth Amendment, see App. 6, and he relied heavily before this Court on *Griswold* v. *Connecticut*, 381 U. S. 479, 484 (1965), which identifies that Amendment as one of the specific constitutional provisions giving "life and substance" to our understanding of privacy. See Brief for Respondent Hardwick 10–12; Tr. of Oral Arg. 33. More importantly, the procedural posture of the case requires that we affirm the Court of Appeals' judgment if there is *any* ground on which respondent may be entitled to relief. This case is before us on petitioner's motion to dismiss for failure to state a claim, Fed. Rule Civ. Proc. 12(b)(6). See App. 17. It is a well-settled principle of law that "a complaint should not be dismissed merely because a plaintiff's allegations do not support the particular legal theory he advances, for the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory."

Supreme Court held that § 26–5901 did not prohibit heterosexual cunnilingus. Georgia passed the act-specific statute currently in force "perhaps in response to the restrictive court decisions such as *Riley*," Note, The Crimes Against Nature, 16 J. Pub. L. 159, 167, n. 47 (1967).

*Bramlet* v. *Wilson*, 495 F. 2d 714, 716 (CA8 1974); see *Parr* v. *Great Lakes Express Co.*, 484 F. 2d 767, 773 (CA7 1973); *Due* v. *Tallahassee Theatres, Inc.*, 333 F. 2d 630, 631 (CA5 1964); *United States* v. *Howell*, 318 F. 2d 162, 166 (CA9 1963); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1357, pp. 601–602 (1969); see also *Conley* v. *Gibson*, 355 U. S. 41, 45–46 (1957). Thus, even if respondent did not advance claims based on the Eighth or Ninth Amendments, or on the Equal Protection Clause, his complaint should not be dismissed if any of those provisions could entitle him to relief. I need not reach either the Eighth Amendment or the Equal Protection Clause issues because I believe that Hardwick has stated a cognizable claim that § 16–6–2 interferes with constitutionally protected interests in privacy and freedom of intimate association. But neither the Eighth Amendment nor the Equal Protection Clause is so clearly irrelevant that a claim resting on either provision should be peremptorily dismissed.[2] The Court's cramped reading of the

[2] In *Robinson* v. *California*, 370 U. S. 660 (1962), the Court held that the Eighth Amendment barred convicting a defendant due to his "status" as a narcotics addict, since that condition was "apparently an illness which may be contracted innocently or involuntarily." *Id.*, at 667. In *Powell* v. *Texas*, 392 U. S. 514 (1968), where the Court refused to extend *Robinson* to punishment of public drunkenness by a chronic alcoholic, one of the factors relied on by JUSTICE MARSHALL, in writing the plurality opinion, was that Texas had not "attempted to regulate appellant's behavior in the privacy of his own home." *Id.*, at 532. JUSTICE WHITE wrote separately:

"Analysis of this difficult case is not advanced by preoccupation with the label 'condition.' In *Robinson* the Court dealt with 'a statute which makes the "status" of narcotic addiction a criminal offense . . . .' 370 U. S., at 666. By precluding criminal conviction for such a 'status' the Court was dealing with a condition brought about by acts remote in time from the application of the criminal sanctions contemplated, a condition which was relatively permanent in duration, and a condition of great magnitude and significance in terms of human behavior and values. . . . If it were necessary to distinguish between 'acts' and 'conditions' for purposes of the Eighth Amendment, I would adhere to the concept of 'condition' implicit in the opinion in *Robinson* . . . . The proper subject of inquiry is whether volitional acts brought about the 'condition' and whether those acts are suf-

issue before it makes for a short opinion, but it does little to make for a persuasive one.

## II

"Our cases long have recognized that the Constitution embodies a promise that a certain private sphere of individual liberty will be kept largely beyond the reach of government." *Thornburgh* v. *American College of Obstetricians & Gynecologists*, 476 U. S. 747, 772 (1986). In construing the right to privacy, the Court has proceeded along two somewhat dis-

ficiently proximate to the 'condition' for it to be permissible to impose penal sanctions on the 'condition.'" *Id.*, at 550–551, n. 2.

Despite historical views of homosexuality, it is no longer viewed by mental health professionals as a "disease" or disorder. See Brief for American Psychological Association and American Public Health Association as *Amici Curiae* 8–11. But, obviously, neither is it simply a matter of deliberate personal election. Homosexual orientation may well form part of the very fiber of an individual's personality. Consequently, under JUSTICE WHITE's analysis in *Powell*, the Eighth Amendment may pose a constitutional barrier to sending an individual to prison for acting on that attraction regardless of the circumstances. An individual's ability to make constitutionally protected "decisions concerning sexual relations," *Carey* v. *Population Services International*, 431 U. S. 678, 711 (1977) (POWELL, J., concurring in part and concurring in judgment), is rendered empty indeed if he or she is given no real choice but a life without any physical intimacy.

With respect to the Equal Protection Clause's applicability to § 16–6–2, I note that Georgia's exclusive stress before this Court on its interest in prosecuting homosexual activity despite the gender-neutral terms of the statute may raise serious questions of discriminatory enforcement, questions that cannot be disposed of before this Court on a motion to dismiss. See *Yick Wo* v. *Hopkins*, 118 U. S. 356, 373–374 (1886). The legislature having decided that the sex of the participants is irrelevant to the legality of the acts, I do not see why the State can defend § 16–6–2 on the ground that individuals singled out for prosecution are of the same sex as their partners. Thus, under the circumstances of this case, a claim under the Equal Protection Clause may well be available without having to reach the more controversial question whether homosexuals are a suspect class. See, *e. g.*, *Rowland* v. *Mad River Local School District*, 470 U. S. 1009 (1985) (BRENNAN, J., dissenting from denial of certiorari); Note, The Constitutional Status of Sexual Orientation: Homosexuality as a Suspect Classification, 98 Harv. L. Rev. 1285 (1985).

tinct, albeit complementary, lines. First, it has recognized a privacy interest with reference to certain *decisions* that are properly for the individual to make. *E. g., Roe* v. *Wade,* 410 U. S. 113 (1973); *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925). Second, it has recognized a privacy interest with reference to certain *places* without regard for the particular activities in which the individuals who occupy them are engaged. *E. g., United States* v. *Karo,* 468 U. S. 705 (1984); *Payton* v. *New York,* 445 U. S. 573 (1980); *Rios* v. *United States,* 364 U. S. 253 (1960). The case before us implicates both the decisional and the spatial aspects of the right to privacy.

## A

The Court concludes today that none of our prior cases dealing with various decisions that individuals are entitled to make free of governmental interference "bears any resemblance to the claimed constitutional right of homosexuals to engage in acts of sodomy that is asserted in this case." *Ante,* at 190–191. While it is true that these cases may be characterized by their connection to protection of the family, see *Roberts* v. *United States Jaycees,* 468 U. S. 609, 619 (1984), the Court's conclusion that they extend no further than this boundary ignores the warning in *Moore* v. *East Cleveland,* 431 U. S. 494, 501 (1977) (plurality opinion), against "clos[ing] our eyes to the basic reasons why certain rights associated with the family have been accorded shelter under the Fourteenth Amendment's Due Process Clause." We protect those rights not because they contribute, in some direct and material way, to the general public welfare, but because they form so central a part of an individual's life. "[T]he concept of privacy embodies the 'moral fact that a person belongs to himself and not others nor to society as a whole.'" *Thornburgh* v. *American College of Obstetricians & Gynecologists,* 476 U. S., at 777, n. 5 (STEVENS, J., concurring), quoting Fried, Correspondence, 6 Phil. & Pub. Affairs 288–289 (1977). And so we protect the decision whether to

marry precisely because marriage "is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects." *Griswold* v. *Connecticut*, 381 U. S., at 486. We protect the decision whether to have a child because parenthood alters so dramatically an individual's self-definition, not because of demographic considerations or the Bible's command to be fruitful and multiply. Cf. *Thornburgh* v. *American College of Obstetricians & Gynecologists, supra,* at 777, n. 6 (STEVENS, J., concurring). And we protect the family because it contributes so powerfully to the happiness of individuals, not because of a preference for stereotypical households. Cf. *Moore* v. *East Cleveland,* 431 U. S., at 500–506 (plurality opinion). The Court recognized in *Roberts,* 468 U. S., at 619, that the "ability independently to define one's identity that is central to any concept of liberty" cannot truly be exercised in a vacuum; we all depend on the "emotional enrichment from close ties with others." *Ibid.*

Only the most willful blindness could obscure the fact that sexual intimacy is "a sensitive, key relationship of human existence, central to family life, community welfare, and the development of human personality," *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 63 (1973); see also *Carey* v. *Population Services International,* 431 U. S. 678, 685 (1977). The fact that individuals define themselves in a significant way through their intimate sexual relationships with others suggests, in a Nation as diverse as ours, that there may be many "right" ways of conducting those relationships, and that much of the richness of a relationship will come from the freedom an individual has to *choose* the form and nature of these intensely personal bonds. See Karst, The Freedom of Intimate Association, 89 Yale L. J. 624, 637 (1980); cf. *Eisenstadt* v. *Baird,* 405 U. S. 438, 453 (1972); *Roe* v. *Wade,* 410 U. S., at 153.

In a variety of circumstances we have recognized that a necessary corollary of giving individuals freedom to choose

how to conduct their lives is acceptance of the fact that different individuals will make different choices. For example, in holding that the clearly important state interest in public education should give way to a competing claim by the Amish to the effect that extended formal schooling threatened their way of life, the Court declared: "There can be no assumption that today's majority is 'right' and the Amish and others like them are 'wrong.' A way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different." *Wisconsin* v. *Yoder*, 406 U. S. 205, 223–224 (1972). The Court claims that its decision today merely refuses to recognize a fundamental right to engage in homosexual sodomy; what the Court really has refused to recognize is the fundamental interest all individuals have in controlling the nature of their intimate associations with others.

B

The behavior for which Hardwick faces prosecution occurred in his own home, a place to which the Fourth Amendment attaches special significance. The Court's treatment of this aspect of the case is symptomatic of its overall refusal to consider the broad principles that have informed our treatment of privacy in specific cases. Just as the right to privacy is more than the mere aggregation of a number of entitlements to engage in specific behavior, so too, protecting the physical integrity of the home is more than merely a means of protecting specific activities that often take place there. Even when our understanding of the contours of the right to privacy depends on "reference to a 'place,'" *Katz* v. *United States*, 389 U. S., at 361 (Harlan, J., concurring), "the essence of a Fourth Amendment violation is 'not the breaking of [a person's] doors, and the rummaging of his drawers,' but rather is 'the invasion of his indefeasible right of personal security, personal liberty and private property.'" *California* v. *Ciraolo*, 476 U. S. 207, 226 (1986) (POWELL, J., dis-

senting), quoting *Boyd* v. *United States*, 116 U. S. 616, 630 (1886).

The Court's interpretation of the pivotal case of *Stanley* v. *Georgia*, 394 U. S. 557 (1969), is entirely unconvincing. *Stanley* held that Georgia's undoubted power to punish the public distribution of constitutionally unprotected, obscene material did not permit the State to punish the private possession of such material. According to the majority here, *Stanley* relied entirely on the First Amendment, and thus, it is claimed, sheds no light on cases not involving printed materials. *Ante,* at 195. But that is not what *Stanley* said. Rather, the *Stanley* Court anchored its holding in the Fourth Amendment's special protection for the individual in his home:

> " 'The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations.'
>
> .         .         .         .         .
>
> "These are the rights that appellant is asserting in the case before us. He is asserting the right to read or observe what he pleases — the right to satisfy his intellectual and emotional needs in the privacy of his own home." 394 U. S., at 564–565, quoting *Olmstead* v. *United States*, 277 U. S., at 478 (Brandeis, J., dissenting).

The central place that *Stanley* gives Justice Brandeis' dissent in *Olmstead*, a case raising *no* First Amendment claim, shows that *Stanley* rested as much on the Court's understanding of the Fourth Amendment as it did on the First. Indeed, in *Paris Adult Theatre I* v. *Slaton*, 413 U. S. 49 (1973), the Court suggested that reliance on the Fourth

Amendment not only supported the Court's outcome in *Stanley* but actually was *necessary* to it: "If obscene material unprotected by the First Amendment in itself carried with it a 'penumbra' of constitutionally protected privacy, this Court would not have found it necessary to decide *Stanley* on the narrow basis of the 'privacy of the home,' which was hardly more than a reaffirmation that 'a man's home is his castle.'" 413 U. S., at 66. "The right of the people to be secure in their . . . houses," expressly guaranteed by the Fourth Amendment, is perhaps the most "textual" of the various constitutional provisions that inform our understanding of the right to privacy, and thus I cannot agree with the Court's statement that "[t]he right pressed upon us here has no . . . support in the text of the Constitution," *ante*, at 195. Indeed, the right of an individual to conduct intimate relationships in the intimacy of his or her own home seems to me to be the heart of the Constitution's protection of privacy.

### III

The Court's failure to comprehend the magnitude of the liberty interests at stake in this case leads it to slight the question whether petitioner, on behalf of the State, has justified Georgia's infringement on these interests. I believe that neither of the two general justifications for § 16–6–2 that petitioner has advanced warrants dismissing respondent's challenge for failure to state a claim.

First, petitioner asserts that the acts made criminal by the statute may have serious adverse consequences for "the general public health and welfare," such as spreading communicable diseases or fostering other criminal activity. Brief for Petitioner 37. Inasmuch as this case was dismissed by the District Court on the pleadings, it is not surprising that the record before us is barren of any evidence to support petitioner's claim.[3] In light of the state of the record, I see

---

[3] Even if a court faced with a challenge to § 16–6–2 were to apply simple rational-basis scrutiny to the statute, Georgia would be required to show

no justification for the Court's attempt to equate the private, consensual sexual activity at issue here with the "possession in the home of drugs, firearms, or stolen goods," *ante*, at 195, to which *Stanley* refused to extend its protection. 394 U. S., at 568, n. 11. None of the behavior so mentioned in *Stanley* can properly be viewed as "[v]ictimless," *ante*, at 195: drugs and weapons are inherently dangerous, see, *e. g.*, *McLaughlin* v. *United States*, 476 U. S. 16 (1986), and for property to be "stolen," someone must have been wrongfully deprived of it. Nothing in the record before the Court provides any justification for finding the activity forbidden by § 16–6–2 to be physically dangerous, either to the persons engaged in it or to others.[4]

---

an actual connection between the forbidden acts and the ill effects it seeks to prevent. The connection between the acts prohibited by § 16–6–2 and the harms identified by petitioner in his brief before this Court is a subject of hot dispute, hardly amenable to dismissal under Federal Rule of Civil Procedure 12(b)(6). Compare, *e. g.*, Brief for Petitioner 36–37 and Brief for David Robinson, Jr., as *Amicus Curiae* 23–28, on the one hand, with *People* v. *Onofre*, 51 N. Y. 2d 476, 489, 415 N. E. 2d 936, 941 (1980); Brief for the Attorney General of the State of New York, joined by the Attorney General of the State of California, as *Amici Curiae* 11–14; and Brief for the American Psychological Association and American Public Health Association as *Amici Curiae* 19–27, on the other.

[4] Although I do not think it necessary to decide today issues that are not even remotely before us, it does seem to me that a court could find simple, analytically sound distinctions between certain private, consensual sexual conduct, on the one hand, and adultery and incest (the only two vaguely specific "sexual crimes" to which the majority points, *ante*, at 196), on the other. For example, marriage, in addition to its spiritual aspects, is a civil contract that entitles the contracting parties to a variety of governmentally provided benefits. A State might define the contractual commitment necessary to become eligible for these benefits to include a commitment of fidelity and then punish individuals for breaching that contract. Moreover, a State might conclude that adultery is likely to injure third persons, in particular, spouses and children of persons who engage in extramarital affairs. With respect to incest, a court might well agree with respondent that the nature of familial relationships renders true consent to incestuous activity sufficiently problematical that a blanket prohibition of such activity

The core of petitioner's defense of § 16–6–2, however, is that respondent and others who engage in the conduct prohibited by § 16–6–2 interfere with Georgia's exercise of the "'right of the Nation and of the States to maintain a decent society,'" *Paris Adult Theatre I* v. *Slaton*, 413 U. S., at 59–60, quoting *Jacobellis* v. *Ohio*, 378 U. S. 184, 199 (1964) (Warren, C. J., dissenting). Essentially, petitioner argues, and the Court agrees, that the fact that the acts described in § 16–6–2 "for hundreds of years, if not thousands, have been uniformly condemned as immoral" is a sufficient reason to permit a State to ban them today. Brief for Petitioner 19; see *ante*, at 190, 192–194, 196.

I cannot agree that either the length of time a majority has held its convictions or the passions with which it defends them can withdraw legislation from this Court's scrutiny. See, *e. g., Roe* v. *Wade*, 410 U. S. 113 (1973); *Loving* v. *Virginia*, 388 U. S. 1 (1967); *Brown* v. *Board of Education*, 347 U. S. 483 (1954).[5] As Justice Jackson wrote so eloquently

is warranted. See Tr. of Oral Arg. 21–22. Notably, the Court makes no effort to explain why it has chosen to group private, consensual homosexual activity with adultery and incest rather than with private, consensual heterosexual activity by unmarried persons or, indeed, with oral or anal sex within marriage.

[5] The parallel between *Loving* and this case is almost uncanny. There, too, the State relied on a religious justification for its law. Compare 388 U. S., at 3 (quoting trial court's statement that "Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. . . . The fact that he separated the races shows that he did not intend for the races to mix"), with Brief for Petitioner 20–21 (relying on the Old and New Testaments and the writings of St. Thomas Aquinas to show that "traditional Judeo-Christian values proscribe such conduct"). There, too, defenders of the challenged statute relied heavily on the fact that when the Fourteenth Amendment was ratified, most of the States had similar prohibitions. Compare Brief for Appellee in *Loving* v. *Virginia*, O. T. 1966, No. 395, pp. 28–29, with *ante*, at 192–194, and n. 6. There, too, at the time the case came before the Court, many of the States still had criminal statutes concerning the conduct at issue. Compare 388 U. S., at 6, n. 5 (noting that 16 States still outlawed interracial marriage), with *ante*, at 193–194 (noting that 24 States and the District of Columbia have sodomy

for the Court in *West Virginia Board of Education* v. *Barnette*, 319 U. S. 624, 641–642 (1943), "we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization. . . . [F]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." See also Karst, 89 Yale L. J., at 627. It is precisely because the issue raised by this case touches the heart of what makes individuals what they are that we should be especially sensitive to the rights of those whose choices upset the majority.

The assertion that "traditional Judeo-Christian values proscribe" the conduct involved, Brief for Petitioner 20, cannot provide an adequate justification for § 16–6–2. That certain, but by no means all, religious groups condemn the behavior at issue gives the State no license to impose their judgments on the entire citizenry. The legitimacy of secular legislation depends instead on whether the State can advance some justification for its law beyond its conformity to religious doctrine. See, *e. g.,* *McGowan* v. *Maryland*, 366 U. S. 420, 429–453 (1961); *Stone* v. *Graham*, 449 U. S. 39 (1980). Thus, far from buttressing his case, petitioner's invocation of Leviticus, Romans, St. Thomas Aquinas, and sodomy's heretical status during the Middle Ages undermines his suggestion that § 16–6–2 represents a legitimate use of secular coercive power.[6] A State can no more punish private behavior be-

statutes). Yet the Court held, not only that the invidious racism of Virginia's law violated the Equal Protection Clause, see 388 U. S., at 7–12, but also that the law deprived the Lovings of due process by denying them the "freedom of choice to marry" that had "long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Id.,* at 12.

[6] The theological nature of the origin of Anglo-American antisodomy statutes is patent. It was not until 1533 that sodomy was made a secular offense in England. 25 Hen. VIII, ch. 6. Until that time, the offense

cause of religious intolerance than it can punish such behavior because of racial animus. "The Constitution cannot control such prejudices, but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore* v. *Sidoti*, 466 U. S. 429, 433 (1984). No matter how uncomfortable a certain group may make the majority of this Court, we have held that "[m]ere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty." *O'Connor* v. *Donaldson*, 422 U. S. 563, 575 (1975). See also *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432 (1985); *United States Dept. of Agriculture* v. *Moreno*, 413 U. S. 528, 534 (1973).

Nor can § 16–6–2 be justified as a "morally neutral" exercise of Georgia's power to "protect the public environment," *Paris Adult Theatre I*, 413 U. S., at 68–69. Certainly, some private behavior can affect the fabric of society as a whole. Reasonable people may differ about whether particular sexual acts are moral or immoral, but "we have ample evidence for believing that people will not abandon morality, will not think any better of murder, cruelty and dishonesty, merely because some private sexual practice which they abominate is not punished by the law." H. L. A. Hart, Immorality and Treason, reprinted in The Law as Literature 220, 225 (L. Blom-Cooper ed. 1961). Petitioner and the Court fail to see the difference between laws that protect public sensibilities and those that enforce private morality. Statutes banning

was, in Sir James Stephen's words, "merely ecclesiastical." 2 J. Stephen, A History of the Criminal Law of England 429–430 (1883). Pollock and Maitland similarly observed that "[t]he crime against nature . . . was so closely connected with heresy that the vulgar had but one name for both." 2 F. Pollock & F. Maitland, The History of English Law 554 (1895). The transfer of jurisdiction over prosecutions for sodomy to the secular courts seems primarily due to the alteration of ecclesiastical jurisdiction attendant on England's break with the Roman Catholic Church, rather than to any new understanding of the sovereign's interest in preventing or punishing the behavior involved. Cf. 6 E. Coke, Institutes, ch. 10 (4th ed. 1797).

public sexual activity are entirely consistent with protecting the individual's liberty interest in decisions concerning sexual relations: the same recognition that those decisions are intensely private which justifies protecting them from governmental interference can justify protecting individuals from unwilling exposure to the sexual activities of others. But the mere fact that intimate behavior may be punished when it takes place in public cannot dictate how States can regulate intimate behavior that occurs in intimate places. See *Paris Adult Theatre I*, 413 U. S., at 66, n. 13 ("marital intercourse on a street corner or a theater stage" can be forbidden despite the constitutional protection identified in *Griswold* v. *Connecticut*, 381 U. S. 479 (1965)).[7]

This case involves no real interference with the rights of others, for the mere knowledge that other individuals do not adhere to one's value system cannot be a legally cognizable interest, cf. *Diamond* v. *Charles*, 476 U. S. 54, 65–66 (1986), let alone an interest that can justify invading the houses, hearts, and minds of citizens who choose to live their lives differently.

## IV

It took but three years for the Court to see the error in its analysis in *Minersville School District* v. *Gobitis*, 310 U. S.

---

[7] At oral argument a suggestion appeared that, while the Fourth Amendment's special protection of the home might prevent the State from enforcing § 16–6–2 against individuals who engage in consensual sexual activity there, that protection would not make the statute invalid. See Tr. of Oral Arg. 10–11. The suggestion misses the point entirely. If the law is not invalid, then the police *can* invade the home to enforce it, provided, of course, that they obtain a determination of probable cause from a neutral magistrate. One of the reasons for the Court's holding in *Griswold* v. *Connecticut*, 381 U. S. 479 (1965), was precisely the possibility, and repugnancy, of permitting searches to obtain evidence regarding the use of contraceptives. *Id.*, at 485–486. Permitting the kinds of searches that might be necessary to obtain evidence of the sexual activity banned by § 16–6–2 seems no less intrusive, or repugnant. Cf. *Winston* v. *Lee*, 470 U. S. 753 (1985); *Mary Beth G.* v. *City of Chicago*, 723 F. 2d 1263, 1274 (CA7 1983).

586 (1940), and to recognize that the threat to national cohesion posed by a refusal to salute the flag was vastly outweighed by the threat to those same values posed by compelling such a salute. See *West Virginia Board of Education* v. *Barnette*, 319 U. S. 624 (1943). I can only hope that here, too, the Court soon will reconsider its analysis and conclude that depriving individuals of the right to choose for themselves how to conduct their intimate relationships poses a far greater threat to the values most deeply rooted in our Nation's history than tolerance of nonconformity could ever do. Because I think the Court today betrays those values, I dissent.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

Like the statute that is challenged in this case,[1] the rationale of the Court's opinion applies equally to the prohibited conduct regardless of whether the parties who engage in it are married or unmarried, or are of the same or different sexes.[2] Sodomy was condemned as an odious and sinful type of behavior during the formative period of the common law.[3]

---

[1] See Ga. Code Ann. § 16–6–2(a) (1984) ("A person commits the offense of sodomy when he performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another").

[2] The Court states that the "issue presented is whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy and hence invalidates the laws of the many States that still make such conduct illegal and have done so for a very long time." *Ante*, at 190. In reality, however, it is the indiscriminate prohibition of sodomy, heterosexual as well as homosexual, that has been present "for a very long time." See nn. 3, 4, and 5, *infra*. Moreover, the reasoning the Court employs would provide the same support for the statute as it is written as it does for the statute as it is narrowly construed by the Court.

[3] See, *e. g.*, 1 W. Hawkins, Pleas of the Crown 9 (6th ed. 1787) ("All unnatural carnal copulations, whether with man or beast, seem to come under the notion of sodomy, which was felony by the antient common law, and punished, according to some authors, with burning; according to others, . . . with burying alive"); 4 W. Blackstone, Commentaries *215

That condemnation was equally damning for heterosexual and homosexual sodomy.[4]   Moreover, it provided no special exemption for married couples.[5]   The license to cohabit and to produce legitimate offspring simply did not include any permission to engage in sexual conduct that was considered a "crime against nature."

The history of the Georgia statute before us clearly reveals this traditional prohibition of heterosexual, as well as homosexual, sodomy.[6]   Indeed, at one point in the 20th century, Georgia's law was construed to permit certain sexual conduct between homosexual women even though such conduct was prohibited between heterosexuals.[7]   The history of the statutes cited by the majority as proof for the proposition that sodomy is not constitutionally protected, *ante*, at 192–194,

---

(discussing "the infamous *crime against nature*, committed either with man or beast; a crime which ought to be strictly and impartially proved, and then as strictly and impartially punished").

[4] See 1 E. East, Pleas of the Crown 480 (1803) ("This offence, concerning which the least notice is the best, consists in a carnal knowledge committed against the order of nature by man with man, or in the same unnatural manner with woman, or by man or woman in any manner with beast"); J. Hawley & M. McGregor, The Criminal Law 287 (3d ed. 1899) ("Sodomy is the carnal knowledge against the order of nature by two persons with each other, or of a human being with a beast. . . . The offense may be committed between a man and a woman, or between two male persons, or between a man or a woman and a beast").

[5] See J. May, The Law of Crimes § 203 (2d ed. 1893) ("Sodomy, otherwise called buggery, bestiality, and the crime against nature, is the unnatural copulation of two persons with each other, or of a human being with a beast. . . . It may be committed by a man with a man, by a man with a beast, or by a woman with a beast, or by a man with a woman—his wife, in which case, if she consent, she is an accomplice").

[6] The predecessor of the current Georgia statute provided: "Sodomy is the carnal knowledge and connection against the order of nature, by man with man, or in the same unnatural manner with woman." Ga. Code, Tit. 1, Pt. 4, § 4251 (1861).   This prohibition of heterosexual sodomy was not purely hortatory.   See, *e. g.*, *Comer* v. *State*, 21 Ga. App. 306, 94 S. E. 314 (1917) (affirming prosecution for consensual heterosexual sodomy).

[7] See *Thompson* v. *Aldredge*, 187 Ga. 467, 200 S. E. 799 (1939).

and nn. 5 and 6, similarly reveals a prohibition on heterosexual, as well as homosexual, sodomy.[8]

Because the Georgia statute expresses the traditional view that sodomy is an immoral kind of conduct regardless of the identity of the persons who engage in it, I believe that a proper analysis of its constitutionality requires consideration of two questions: First, may a State totally prohibit the described conduct by means of a neutral law applying without exception to all persons subject to its jurisdiction? If not, may the State save the statute by announcing that it will only enforce the law against homosexuals? The two questions merit separate discussion.

I

Our prior cases make two propositions abundantly clear. First, the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack.[9] Second, individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of "liberty" protected by the Due Process Clause of the Fourteenth Amendment. *Griswold* v. *Connecticut*, 381 U. S. 479 (1965). Moreover, this protection extends to intimate choices by unmarried as well as married persons. *Carey* v. *Population Services International*, 431 U. S. 678 (1977); *Eisenstadt* v. *Baird*, 405 U. S. 438 (1972).

---

[8] A review of the statutes cited by the majority discloses that, in 1791, in 1868, and today, the vast majority of sodomy statutes do not differentiate between homosexual and heterosexual sodomy.

[9] See *Loving* v. *Virginia*, 388 U. S. 1 (1967). Interestingly, miscegenation was once treated as a crime similar to sodomy. See Hawley & McGregor, The Criminal Law, at 287 (discussing crime of sodomy); *id.*, at 288 (discussing crime of miscegenation).

In consideration of claims of this kind, the Court has emphasized the individual interest in privacy, but its decisions have actually been animated by an even more fundamental concern. As I wrote some years ago:

"These cases do not deal with the individual's interest in protection from unwarranted public attention, comment, or exploitation. They deal, rather, with the individual's right to make certain unusually important decisions that will affect his own, or his family's, destiny. The Court has referred to such decisions as implicating 'basic values,' as being 'fundamental,' and as being dignified by history and tradition. The character of the Court's language in these cases brings to mind the origins of the American heritage of freedom—the abiding interest in individual liberty that makes certain state intrusions on the citizen's right to decide how he will live his own life intolerable. Guided by history, our tradition of respect for the dignity of individual choice in matters of conscience and the restraints implicit in the federal system, federal judges have accepted the responsibility for recognition and protection of these rights in appropriate cases." *Fitzgerald* v. *Porter Memorial Hospital,* 523 F. 2d 716, 719–720 (CA7 1975) (footnotes omitted), cert. denied, 425 U. S. 916 (1976).

Society has every right to encourage its individual members to follow particular traditions in expressing affection for one another and in gratifying their personal desires. It, of course, may prohibit an individual from imposing his will on another to satisfy his own selfish interests. It also may prevent an individual from interfering with, or violating, a legally sanctioned and protected relationship, such as marriage. And it may explain the relative advantages and disadvantages of different forms of intimate expression. But when individual married couples are isolated from observation by others, the way in which they voluntarily choose to conduct their intimate relations is a matter for them—not the

State—to decide.[10]    The essential "liberty" that animated the development of the law in cases like *Griswold*, *Eisenstadt*, and *Carey* surely embraces the right to engage in nonreproductive, sexual conduct that others may consider offensive or immoral.

Paradoxical as it may seem, our prior cases thus establish that a State may not prohibit sodomy within "the sacred precincts of marital bedrooms," *Griswold*, 381 U. S., at 485, or, indeed, between unmarried heterosexual adults.    *Eisenstadt*, 405 U. S., at 453.    In all events, it is perfectly clear that the State of Georgia may not totally prohibit the conduct proscribed by § 16–6–2 of the Georgia Criminal Code.

## II

If the Georgia statute cannot be enforced as it is written— if the conduct it seeks to prohibit is a protected form of liberty for the vast majority of Georgia's citizens—the State must assume the burden of justifying a selective application of its law.    Either the persons to whom Georgia seeks to apply its statute do not have the same interest in "liberty" that others have, or there must be a reason why the State may be permitted to apply a generally applicable law to certain persons that it does not apply to others.

The first possibility is plainly unacceptable.    Although the meaning of the principle that "all men are created equal" is not always clear, it surely must mean that every free citizen has the same interest in "liberty" that the members of the majority share.    From the standpoint of the individual, the homosexual and the heterosexual have the same interest in deciding how he will live his own life, and, more narrowly, how he will conduct himself in his personal and voluntary

---

[10] Indeed, the Georgia Attorney General concedes that Georgia's statute would be unconstitutional if applied to a married couple.    See Tr: of Oral Arg. 8 (stating that application of the statute to a married couple "would be unconstitutional" because of the "right of marital privacy as identified by the Court in Griswold").    Significantly, Georgia passed the current statute three years after the Court's decision in *Griswold*.

associations with his companions. State intrusion into the private conduct of either is equally burdensome.

The second possibility is similarly unacceptable. A policy of selective application must be supported by a neutral and legitimate interest—something more substantial than a habitual dislike for, or ignorance about, the disfavored group. Neither the State nor the Court has identified any such interest in this case. The Court has posited as a justification for the Georgia statute "the presumed belief of a majority of the electorate in Georgia that homosexual sodomy is immoral and unacceptable." *Ante,* at 196. But the Georgia electorate has expressed no such belief—instead, its representatives enacted a law that presumably reflects the belief that *all sodomy* is immoral and unacceptable. Unless the Court is prepared to conclude that such a law is constitutional, it may not rely on the work product of the Georgia Legislature to support its holding. For the Georgia statute does not single out homosexuals as a separate class meriting special disfavored treatment.

Nor, indeed, does the Georgia prosecutor even believe that all homosexuals who violate this statute should be punished. This conclusion is evident from the fact that the respondent in this very case has formally acknowledged in his complaint and in court that he has engaged, and intends to continue to engage, in the prohibited conduct, yet the State has elected not to process criminal charges against him. As JUSTICE POWELL points out, moreover, Georgia's prohibition on private, consensual sodomy has not been enforced for decades.[11] The record of nonenforcement, in this case and in the last several decades, belies the Attorney General's representa-

---

[11] *Ante,* at 198, n. 2 (POWELL, J., concurring). See also Tr. of Oral Arg. 4–5 (argument of Georgia Attorney General) (noting, in response to question about prosecution "where the activity took place in a private residence," the "last case I can recall was back in the 1930's or 40's").

tions about the importance of the State's selective application of its generally applicable law.[12]

Both the Georgia statute and the Georgia prosecutor thus completely fail to provide the Court with any support for the conclusion that homosexual sodomy, *simpliciter*, is considered unacceptable conduct in that State, and that the burden of justifying a selective application of the generally applicable law has been met.

## III

The Court orders the dismissal of respondent's complaint even though the State's statute prohibits all sodomy; even though that prohibition is concededly unconstitutional with respect to heterosexuals; and even though the State's *post hoc* explanations for selective application are belied by the State's own actions. At the very least, I think it clear at this early stage of the litigation that respondent has alleged a constitutional claim sufficient to withstand a motion to dismiss.[13]

I respectfully dissent.

---

[12] It is, of course, possible to argue that a statute has a purely symbolic role. Cf. *Carey* v. *Population Services International*, 431 U. S. 678, 715, n. 3 (1977) (STEVENS, J., concurring in part and concurring in judgment) ("The fact that the State admittedly has never brought a prosecution under the statute . . . is consistent with appellants' position that the purpose of the statute is merely symbolic"). Since the Georgia Attorney General does not even defend the statute as written, however, see n. 10, *supra*, the State cannot possibly rest on the notion that the statute may be defended for its symbolic message.

[13] Indeed, at this stage, it appears that the statute indiscriminately authorizes a policy of selective prosecution that is neither limited to the class of homosexual persons nor embraces all persons in that class, but rather applies to those who may be arbitrarily selected by the prosecutor for reasons that are not revealed either in the record of this case or in the text of the statute. If that is true, although the text of the statute is clear enough, its true meaning may be "so intolerably vague that evenhanded enforcement of the law is a virtual impossibility." *Marks* v. *United States*, 430 U. S. 188, 198 (1977) (STEVENS, J., concurring in part and dissenting in part).