**Killian B. SWIFT, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. No. 85–1685.**

United States District Court, District of Columbia.

Dec. 5, 1986.

Arthur B. Spitzer, Elizabeth Symonds, ACLU, Charles Lister, David H. Remes, Elliott Schulder, Covington & Burling, Washington, D.C., for plaintiff.

Mary E. Goetten, Jeffrey S. Paulsen, Civil Div., Washington, D.C., for defendant.

## OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff Killian B. Swift brings this suit alleging that the government unreasonably and unlawfully denied him access to the White House to perform his duties as a stenographer, thereby violating his rights under the Administrative Procedure Act and the Constitution. Defendant has moved to dismiss the complaint for failure to state a claim upon which relief can be granted. For the reasons set forth below, the Court will grant defendant's motion with respect to certain counts, and deny it with respect to the remainder.

### . I.

Plaintiff Swift worked at the White House for nearly two years recording and transcribing the President's public speeches and press conferences—first for the TTW Reporting Company and, after that company went bankrupt, for Koba Associates, Inc. ("Koba"). Both companies were under contract with the Defense Supply System ("DSS"), which required that all contractor personnel possess a White House access clearance. Plaintiff maintained such a security clearance from February 26, 1982 through January 3, 1984, except for a six-week period in 1983 between the termination of TTW's contract with DSS and the commencement of Koba's contract. Plaintiff alleges that in the fall of 1983, an agent of defendant, Dennis Sculimbrene, approached plaintiff's supervisor, Marcia Baggott, and asked her whether plaintiff is homosexual. Ms. Baggott confirmed that, to her knowledge, he is. On January 3, 1984, defendant notified Koba that plaintiff had been determined to be a security risk and that he would no longer be permitted access to the White House complex. Immediately thereafter Koba terminated plaintiff's employment.

Plaintiff's mother wrote Nancy Reagan, inquiring into the reasons for the revocation of her son's security clearance, and was advised in a letter of February 3, 1984, from Richard Hauser, Deputy Counsel to the President, that "no determination was made that your son is a 'national security risk.'" Complaint, ¶ 12. To date, defendant has refused to restore plaintiff's security clearance, provide him or Koba any explanation for the loss of that clearance, or offer him an opportunity to clear his name.

Plaintiff alleges that defendant has never terminated a reporter/transcriber's White House access for any reason other than a failure to perform contract obligations satisfactorily, and that this practice gave rise to a justifiable expectation of continued access to the White House amounting to a property right in such access. Defendant's actions, he asserts, deprived him of this property right without due process, in violation of the fifth amendment. He further alleges that he was deprived of liberty without due process by virtue of defendant's statement to Koba

that plaintiff is a security risk—a determination that plaintiff claims is false and which was given effect without any accompanying explanation or opportunity for a name-clearing. Plaintiff also claims that in basing the termination decision on his homosexuality, defendant violated his privacy and associational rights, and deprived him of equal protection of the laws. Finally, plaintiff contends that the revocation of his clearance was arbitrary and capricious and therefore violated his rights under the Administrative Procedure Act.

## II.

### A. *Plaintiff's Property Interest*

Defendant moves to dismiss plaintiff's claim that he was deprived of property without due process of law on the ground that plaintiff had no legitimate property right in continued access to the White House. To possess a property interest in a given benefit, a person must have a "legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Such an entitlement is "created and ... defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* Where a claim of entitlement rests on understandings, they must be *"mutually explicit* understandings," *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) (emphasis supplied); a "unilateral expectation" is insufficient. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. As this case demonstrates, this test is often more easily stated than applied. Plaintiff contends that the government had never terminated a reporter/transcriber's access to the White House for any reasons other than a failure to perform contractual obligations satisfactorily, or a determination that the person was a security risk. He characterizes this practice as a "consistent, positive action" on the part of the government—one that gave rise to a justifiable expectation on his part that his security

clearance would not be denied for any other reason. The government, on the other hand, argues that its inaction does not amount to a consistent past practice, and that plaintiff's claim of entitlement rests on nothing more than a purely subjective expectation of continued access.

In resisting defendant's motion to dismiss, plaintiff relies principally on two cases, which, he contends, demonstrate that "the consistent, positive action of government officials" can give rise to a property interest in continued access to government facilities. In *Phillips v. Bureau of Prisons,* 591 F.2d 966 (D.C.Cir. 1979), the District of Columbia Circuit held that a paralegal had a protected property interest in access to federal prisons. The Court noted that defendant had a "longstanding policy of extending visitation privileges liberally to attorneys" and that paralegals were "routinely granted access to federal prisoners." *Id.* at 971 (footnotes omitted). This "consistent, positive action," the Court concluded, created "a justifiable expectation that the only basis for the government's refusal to grant entrance is concern for internal security, order and discipline," and accordingly that plaintiff had a legitimate claim of entitlement to continued access. *Id.* (footnote omitted). In *Sherrill v. Knight,* 569 F.2d 124 (D.C. Cir.1977), a Washington-based reporter challenged the government's refusal to grant him a White House press pass. Unlike the situation in *Phillips,* where published regulations set out the standards for access to federal prisons, in *Sherrill* there were no published guidelines governing the issuance of press passes. Nevertheless, plaintiff demonstrated that such passes were routinely issued to journalists who resided in the Washington area, possessed passes for the House and Senate galleries, and needed to report from the White House on a regular basis. Plaintiff satisfied these criteria, but the government denied him access and refused to explain the basis of its decision. While holding that plaintiff had been denied his first amendment *liberty* interest without due process, the Court

noted in a footnote that plaintiff may also have been deprived of a "related and perhaps equally compelling *property* interest." *Id.* at 131 n. 22 (emphasis in original).

> It is apparent that all parties to this case recognize the right of a journalist to a White House press pass if he has obtained House and Senate press credentials, resides in Washington, and has a need to report from the White House, *unless* he is a source of potential danger to the President or his family. There is no indication in the record that the Secret Service has ever denied press credentials for any other reason. Nor is the Secret Service authorized to deny credentials for non-security-related reasons. It could be argued, convincingly we believe, that in these circumstances, appellee has a justifiable expectation that the only basis for the government's refusal to grant a White House press pass is concern for the physical security of the President or his family. While appellee's entitlement is not created expressly by the Constitution or by positive federal law, it is created by the consistent, positive action of government officials.

*Id.* (citation omitted) (emphasis in original). Plaintiff contends that, like the plaintiffs in *Phillips* and *Sherrill,* he has a legitimate claim of entitlement to continued White House access based on the fact that the government has consistently granted access to stenographers such as himself, unless they fail to discharge their duties or are deemed security risks.

As plaintiff recognizes, however, both cases are distinguishable from the present dispute. In *Phillips,* as noted above, the plaintiff's justifiable expectation of access arose from published regulations governing visitation rights for attorneys; those regulations created and defined the plaintiff-paralegal's legitimate entitlement. Here, no rules or regulations define plaintiff's right to access to the White House complex. His entitlement, therefore, hinges on his claim that the government has a consistent practice of denying access only for cause—a claim which the Court must accept as true for present purposes. In *Sherrill,* of course, the Court did not actually hold that the practice of the White House Press Office gave rise to a property right, but merely suggested that such a claim could be convincingly argued. In making this suggestion, however, the Court noted that ancillary constitutional values lent substantial force to a claim of a protected property interest. In the footnote quoted above, the Court stated that "when the substance of the property interest involves first amendment values to the degree of this entitlement to a White House press pass, it would be difficult not to infer constitutional recognition of this interest." 569 F.2d at 131 n. 22. Plaintiff has not, nor could he, claim that his entitlement to access to the White House as a stenographer is in any way fortified by first amendment values. His asserted property right, therefore, must arise solely from the practice he has identified, without benefit of any ancillary constitutional values.

■ Defendant characterizes this practice as simply one of inaction, and argues that the government's prior failure to exercise its discretion and deny security clearances for reasons other than those enumerated by plaintiff cannot give rise to a property right. The Ninth Circuit, in *Bollow v. Federal Reserve Bank of San Francisco,* 650 F.2d 1093 (9th Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982), ruled that merely because the Federal Reserve Bank had never before fired an employee with ten years' tenure for the reasons plaintiff was terminated did not give rise to a property interest in continued employment. The Court noted that "there must have been at least some sort of affirmative conduct on the part of the Bank" in order to create such an interest. *Id.* at 1099.[1] Here, plaintiff has identified no af-

---

1. Plaintiff attempts to distinguish *Bollow* on the ground that in that case the plaintiff was an employee-at-will. This distinction is irrelevant. It was precisely because he could be terminated

firmative conduct on the government's part—no published regulations such as those in *Phillips*, or in *Perry v. Sindermann*, where the Supreme Court found that provisions in an official college publication, coupled with a practice of re-hiring faculty members, may have created a property interest in continued employment. *See* 408 U.S. at 599–600, 92 S.Ct. at 2698–99. In *Williams v. Barry*, 708 F.2d 789 (D.C.Cir.1983), this Circuit expressed reservations about the district court's finding that the District of Columbia's practice of providing food and shelter to the homeless, along with statements by city officials concerning the city's policy on the provision of such services, gave rise to a property interest. Although the city did not challenge this ruling on appeal, the court characterized the statements, declarations and actions of the city officials as "weak and inconsistent ... evidence of [an] entitlement." *Id.* at 792.[2] Here, plaintiff has offered no statements or declarations whatever. His claim of entitlement rests exclusively on conduct that defendant plausibly describes as mere inertia, or a failure to act. Under these circumstances, the Court is constrained to conclude that defendant's failure to terminate security clearances for reasons other than cause, standing alone, does not create mutually explicit understandings conferring a property right in continued access to the White House. Accordingly, count three of plaintiff's amended complaint must be dismissed.

## B. *Plaintiff's Liberty Interest*

■ Defendant also moves to dismiss plaintiff's claim that the termination of his security .clearance damaged his reputation such that he was deprived of a constitutionally protected liberty interest. To make out such a claim, plaintiff must show (1) that the government's defamation resulted in some harm beyond damage to his reputa-

tion, and (2) that he has been stigmatized by the government's action. *Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1111 (D.C.Cir.1985). Because plaintiff cannot satisfy this first requirement, the Court must dismiss this portion of the complaint.

Plaintiff has alleged that the government's action here has prevented him from performing his duties under Koba's contract with DSS, and has "damaged [his] reputation, tarnishing his standing and associations in the community and threatening to foreclose future employment opportunities...." Amended Complaint, ¶ 15. This allegation of harm, however, is legally insufficient. Plaintiff must show either a loss of present or future *government* employment, *Doe v. United States Dep't of Justice*, 753 F.2d at 1111, or the deprivation of some legal right, such as the loss of the right to purchase liquor within a state, *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), to compete for all government contract work, *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953 (D.C.Cir. 1980), or to attend public school, *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). This Circuit has stated, however, that the foreclosure of future private sector employment does not constitute a loss of some legal right or a change in legal status. *Bartel v. FAA*, 725 F.2d 1403, 1415–16 (D.D.C.1984); *Mosrie v. Barry*, 718 F.2d 1151, 1162 (D.C.Cir.1983). "The reaction of others to unfavorable publicity about a person is not ... a change in legal status imposed by the government officials who generated the publicity.... Financial loss and loss of some employment opportunities do not, therefore, amount to an alteration of a legal right." *Mosrie v. Barry*, 718 F.2d at 1162. *See also Doe v. United States Dep't of Justice*, 753 F.2d at 1111 n. 20 ("*Bartel* suggested that the possible harmful effects of the [government's defamation] on future private sector

at the will of his employer that Bollow attempted to demonstrate that he had a property interest in his job. The Court, however, made no mention of his at-will status in concluding that he had no property right in continuing his employment.

2. Judge Bork's concurrence was more critical. He wrote that the plaintiff's claim of a protected property interest was "insubstantial" and opined that had the lower court's finding been appealed it was "highly likely that no process would have been found due." 708 F.2d at 793.

employment were not actionable under the liberty clause"). Plaintiff attempts to escape the effect of these holdings by arguing that his defamation resulted in his loss of a public benefit, namely his protected property interest. This Court, however, has already determined that he in fact enjoyed no such entitlement.[3] Accordingly, plaintiff has failed to satisfy the "reputation plus" standard of *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), and therefore cannot claim a loss of a protected liberty interest. The Court, therefore, must dismiss count two of the amended complaint.

## C. *Plaintiff's Privacy Right, Freedom of Association and Equal Protection Claims*

Plaintiff also alleges that his security clearance was terminated solely because he is homosexual, and that such discriminatory action deprived him of his privacy and associational rights, and denied him his right to equal protection under the law. Defendant moves to dismiss these counts on the ground that homosexual conduct is not constitutionally protected, and thus, even if plaintiff's sexuality formed the basis of the government's action, he is entitled to no relief. Since the parties briefed and argued this case, the Supreme Court handed down its decision in *Bowers v. Hardwick,* —— U.S. ——, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), in which it refused to extend the right of privacy to cover homosexual conduct. Notwithstanding the

*Hardwick* majority's rather sweeping rejection of the right of privacy claims advanced on behalf of homosexual conduct, this Circuit has declined, at least for the moment, to read that decision as barring claims of discrimination based on sexual preference. In *Doe v. Casey,* 796 F.2d 1508, 1522 (D.C.Cir.1986), the Court of Appeals noted that the *Hardwick* decision "did not reach the difficult issue of whether an agency of the federal government can discriminate against individuals merely because of [their] sexual *orientation*" (emphasis in original). Here, plaintiff's precise claim is that he was discriminated against solely on the basis of his sexual preference, not for any conduct in which he engaged. In light of *Doe v. Casey,* this Court cannot say that plaintiff has failed to state a right of privacy claim, and accordingly, defendant's motion to dismiss count five of the complaint must be denied.[4]

With respect to his associational and equal protection claims, plaintiff argues that regardless of the degree of constitutional protection afforded homosexual conduct, his claim is sufficient to withstand a motion to dismiss since he has alleged that the termination of his access was irrational and served no legitimate governmental purpose. He contends that there is simply no rational relationship between his sexual orientation and his fitness to record and transcribe the President's speeches. Thus, even under the most deferential standard of scrutiny, the government's action impermissibly burdened his associational rights

---

**3.** Plaintiff argues that the public benefit loss need not rise to the level of a protected entitlement, citing *Doe v. United States Dep't of Justice,* 753 F.2d at 1107, 1110 n. 18. In *Doe,* however, the Court simply noted that at-will government employees need not demonstrate a protected property interest in continued employment in order to state a claim under the liberty clause. In such cases, of course, the employee has lost a *government* job, and thus clearly can demonstrate a harm beyond damage to reputation.

**4.** In response to a letter submitted by plaintiff, the government attempts to distinguish *Doe* on three grounds: (1) that the agency action in *Doe* was only subject to judicial review because a statute limited the authority of the Central Intelligence Agency to discharge employees; (2) the plaintiff in *Doe* was a federal employee; and (3)

the "arguable claim" presented in *Doe* was whether the agency could bar *all* homosexuals from employment. None of these distinctions has any merit. Regardless of whether a given agency action is reviewable under the Administrative Procedure Act or is instead committed to agency discretion, no agency has the discretionary authority to violate constitutional rights. The fact that plaintiff here was not a federal employee is likewise irrelevant, since the government is no more free to violate the constitutional rights of private citizens then its own employees. Finally, nothing in *Doe* suggests that while uniform discrimination against homosexuals on the basis of their sexual orientation is arguably illegal, random discrimination on the same basis is somehow permissible.

and violated his equal protection rights by discriminating against him solely on the basis of his homosexuality.

The government has not offered any explanation as to how plaintiff's dismissal is rationally related to a legitimate governmental purpose. Instead, defendant makes the rather remarkable argument that because this case does not involve a legislative classification, but instead a single, ad hoc decision, the equal protection clause is inapplicable. It is well established, however, that the equal protection clause protects against "arbitrary or discriminatory treatment by the Government." *Scott v. Macy,* 349 F.2d 182, 184 (D.C.Cir.1965). Indeed, in *Scott,* an applicant for federal employment raised a successful equal protection challenge to the Civil Service Commission's decision to disqualify him for employment because of alleged homosexual conduct. In ruling for the applicant, the Court noted that even though the Executive may have discretionary authority in certain matters, such as hiring or firing, "[d]iscretionary power does not carry with it the right to its arbitrary exercise." *Id.* The Court was clearly untroubled by the fact that the applicant's equal protection claim was based on a single, ad hoc decision. *See also Doe v. United States Postal Service,* 84–3296 (D.D.C. June 12, 1985) (denying motion to dismiss transsexual's claim that defendant's rescission of employment offer violated equal protection).

Defendant also claims that because plaintiff is not entitled to a statement of reasons for the revocation of his security clearance under the fifth amendment's property or liberty clauses, "it is difficult to see how defendant can be required to provide a 'rational basis' and a 'legitimate government interest' for that same decision under the equal protection clause." Defendant's Reply at 19. The Court, however, does not share defendant's difficulty. Regardless of this Court's conclusion that plaintiff has not been deprived of any liberty interest, it is simply untenable for the government to suggest that the fifth amendment's due process and equal protection clauses are coterminous, and that the unavailability of relief under the former somehow forecloses

redress through the latter. The two clauses do not even provide the same protections or, where violations are made out, the same relief. Had plaintiff been able to demonstrate a deprivation of a protected liberty interest he might only have been entitled to some type of name-clearing hearing. A showing that defendant denied him equal protection of the laws, on the other hand, may warrant declaratory or injunctive relief. In any event, the Court cannot accept defendant's argument that because certain relief may not be available under the due process clause, there can be no claim brought under the equal protection clause. Homosexual conduct may not be protected under the right of privacy, and homosexuals may not qualify as a suspect class. Nonetheless, the government may not discriminate against homosexuals for the sake of discrimination, or for no reason at all. Defendant's motion to dismiss, therefore, is denied with respect to counts four and six of the complaint.

### D. *Plaintiff's APA Claim*

■ Defendant seeks to dismiss plaintiff's claim under the Administrative Procedure Act (APA) on the grounds that the APA does not apply to the White House and that termination of plaintiff's access to the White House was a matter committed entirely to the White House's discretion. In response, plaintiff argues that such a motion is premature at this stage of the proceedings because he has not determined which agency or officials terminated his clearance. The decision may have been made by the Secret Service, the Federal Bureau of Investigation, the Department of Defense or an official within the White House itself. Plaintiff does not yet know, thus he made no allegation charging the White House with responsibility for the decision. Defendant does not suggest that the other agencies that plaintiff has identified as possibly responsible for the decision are not subject to the review under the APA. Until such time as the appropriate agency or official has been identified, therefore, this Court declines to dismiss this portion of plaintiff's complaint, or to address defendant's contention that the ac-

tions of the White House are not subject to audit under the APA.[5]  Accordingly, defendant's motion to dismiss count one of the complaint is denied.

For all the foregoing reasons, therefore, it is this 5th day of December, 1986,

ORDERED that defendant's motion to dismiss the complaint for failure to state a claim upon which relief can be granted be and it hereby is granted with respect to counts two and three of plaintiff's amended complaint, and it hereby is denied with respect to counts one, four, five and six.

SO ORDERED.

### ORDER

It is hereby ORDERED by the Court that the above-entitled case be, and it hereby is, referred to the United States Magistrate for discovery proceedings.

Unless otherwise ordered by the Court, contested preliminary motions within Rule 3–8 of the Rules of the United States District Court for the District of Columbia will also be heard by the Magistrate.  All other motions will be heard by the Court.

---

5. The Court similarly declines to decide at this time whether the relief requested—an injunction—renders this case non-justiciable.  Injunctive relief may lie against an agency or other official.  The Court cannot say based on the present record and need not speculate at this time.