**Vernon R. JANTZ, Plaintiff,**

v.

**Cleofas F. MUCI, Defendant.**

**No. 89–1628–K.**

United States District Court,
D. Kansas.

March 29, 1991.
Motion for Reconsideration Denied
May 28, 1991.

James S. Phillips, Jr., Phillips & Phillips, Wichita, Kan., for plaintiff.

William H. Dye, Susan L. Smith, Foulston & Siefkin, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

Plaintiff Vernon Jantz has brought the present action under 42 U.S.C. § 1983, alleging a violation of his right to equal protection. The plaintiff alleges that he was denied by the defendant, then-school principal Cleofas Muci, employment as a public school teacher on the basis of Muci's perception that Jantz had "homosexual tendencies." The defendant has now moved for summary judgment.

Arguments relating to the defendant's motion were presented to the court in a hearing conducted March 21, 1991. Consistent with the views of the court expressed during the course of the hearing,

and for the reasons addressed herein, the court hereby grants in part, and denies in part, the defendant's motion for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R. Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Vernon Jantz graduated from high school in Newton, Kansas in 1963. He graduated cum laude from Wichita State University, receiving a bachelor's degree from Wichita State University in 1972 and a master's degree in 1978. After serving in the United States Air Force, Jantz completed course work in secondary education at Western New Mexico State University, and obtained a New Mexico secondary school teaching permit in 1985.

During the 1985–86 school year, Jantz taught social studies in the New Mexico schools. Jantz and his wife moved to Wichita, Kansas in the summer of 1986. Obtaining Kansas certification in September, 1986, Jantz took employment with Unified School District No. 259 and began substitute teaching for the district in early 1987. Jantz substituted at several middle and elementary schools in the district, including Wichita North High School.

During this time, Jantz did no coaching. In his interviews with school administrators, including an interview conducted by a Wichita North administrative officer on behalf of Muci, Jantz did not volunteer to perform coaching activities. By the same token, Jantz was not asked whether he was able and willing to assume coaching responsibilities. Jantz, who had experience in basketball, baseball, soccer, and tennis, was able to coach, and would have done so had he been asked.

In May, 1987, Jantz contacted the district's Director of Secondary Personnel, Frank Crawford, and inquired about the possibility of obtaining a teacher's position for the 1987–88 school year. Despite his talk with Crawford, it remained uncertain whether there were any openings for the upcoming school year. Jantz interviewed at Wichita South and at Wichita North (with associate principal Milford Johnson). However, as it turned out, no positions were open for the 1987–88 school year at the schools where Jantz interviewed. As with the previous year, Jantz provided substitute teaching services during the 1987–88 school year.

Jantz met with Crawford's successor, Jane Ware, in February, 1988. Due to the

upcoming merger of ninth grade students into the Wichita high schools, a combined social studies teacher and coach position was created at Wichita North for the 1988–89 school year. Jantz applied for the position.

The contentions of fact presented by the parties establish that the principals of the individual schools in the district exercise *de facto* the predominant role in hiring decisions, with some input by the district personnel office. The principal usually conducts the job interview with any applicant and his determination is normally decisive.

Jantz's application was turned down and Matthew Silverthorne was selected to fill the new position. The parties dispute the reason for this decision by Wichita North's principal, Cleofas Muci. Muci was principal of Wichita North for the 1986–87 and 1987–88 school years. Muci retired in November, 1988.

According to Muci, he hired Silverthorne because he was the best candidate. Silverthorne had student taught and coached at Wichita North. In Muci's opinion, Silverthorne had done a good job while coaching.[1] Silverthorne was certified to teach social studies (with the exception of world geography, in which he had only a provisional certification).

Jantz disputes this version of the decision to hire Silverthorne. Jantz cites the testimony of Sharon Fredin (Muci's secretary) and William Jenkins (the coordinator of social studies at Wichita North). Fredin has acknowledged in her deposition that during the 1987–88 school year she "made the offhand comment" to Muci that Jantz reminded her of her husband, whom she believed to be a homosexual. Jenkins has testified that when he asked why Jantz was not hired for the new position, Muci told him it was because of Jantz's "homosexual tendencies."

After being denied the social sciences position at Wichita North, Jantz worked during the 1989–90 school year as a (half-time) social studies teacher and a (half-time) facilitator for gifted students at Jardine Middle School. Jantz currently is em-ployed full-time as a facilitator for gifted students at Hadley Intermediate School. Jantz is a 45–year–old white male. He is married with two children.

The positions of the parties are diametrically opposed, and under the rules of summary judgment the court must accept the plaintiff's version as correct. Defendant Muci makes several arguments seeking to contradict the plaintiff's version: he stresses Jenkins' misspelling of Muci's name in his affidavit, suggests that his ex-secretary Fredin's "recollection is questionable," and generally denies any discriminatory intent against homosexuals. Muci also spills a great deal of ink in his briefs arguing from the premise that Muci simply made a professional, good faith selection of the candidate he believed to be the better qualified.

The problem, of course, is that the rules of summary judgment do not allow such a premise. Under those rules, Jantz's version of the events leading to the selection of Silverthorne must be taken as true. Muci is entitled to argue his version to the jury at the trial of the present matter, but for purposes of resolving the present motion for summary judgment, the court must accept as true that the real reason for the failure to hire Jantz was Muci's belief that Jantz had "homosexual tendencies."

The court concludes that Jantz has articulated a claim which, if proven at trial, sets forth a violation of his constitutional rights under 42 U.S.C. § 1983. "[T]he time has come today for private, consenting, adult homosexuality to enter the sphere of constitutionally protectable interests." *Acanfora v. Board of Educ.*, 359 F.Supp. 843, 851 (D.Md.1973), *aff'd on other grounds*, 491 F.2d 498 (4th Cir.); *cert. denied*, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974). The court will address Jantz's equal protection claim under two potentially relevant standards. The court will discuss the claim in the context of both a heightened scrutiny analysis, and in the additional context of the potential arbitrary and capricious nature of the classification. The court will then address the defendant's claim to qualified immunity as it relates to both the

---

1. The defendant alleges, at p. 9 of his reply brief, that Silverthorne was an "avid" coach who volunteered for coaching assignments. The cit-ed portion of Muci's deposition testimony establishes neither point, only that he performed his coaching responsibilities well.

heightened scrutiny and rational basis analyses.

*Heightened Scrutiny*

■ In *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), the Supreme Court held that the due process clause of the Fourteenth Amendment does not prohibit the states from criminalizing homosexual sodomy. That case, cited by defendant Muci, is not directly relevant here. The *Bowers* Court only addressed the respondent's claim that the Georgia statute was a violation of due process; equal protection was not in issue. The case presented the limited issue of whether homosexual *conduct* could be regulated by the states. Whether a state or its agents may discriminate among citizens on the basis of their sexual orientation was not at issue.

The distinction between conduct and orientation is both proper and useful in analyzing the constitutional rights of homosexuals. *See* Sunstein, *Sexual Orientation and the Constitution: A Note on the Relationship Between Due Process and Equal Protection,* 55 U.Chi.L.Rev. 1161, 1162 (1988). Due process, which was at issue in *Bowers,* serves as a limitation of majoritarian restrictions of traditionally favored and sanctioned activities and rights; it necessarily focuses on historical practice and tradition. Equal protection, on the other hand, protects disadvantaged groups of individuals from governmental discrimination, even where the discrimination is enshrined in a deep historical tradition. *Id.* at 1163, 1170–74. *Bowers* merely established that homosexual conduct was not a recognized historical liberty. The case does not deal with the issue of whether societal bigotry against private homosexual orientation or tendencies legitimizes governmental discrimination against homosexuals under equal protection. *See* John Charles Hayes, *The Tradition of Prejudice Versus the Principle of Equality: Homosexuals and Heightened Equal Protection Scrutiny After Bowers v. Hardwick,* 31 B.C.L.Rev. 375 (1990). Indeed, as Judge Norris recognized in his concurring opinion in *Watkins v. United States Army,* 875 F.2d 699, 711 (9th Cir.1989) (Norris, J., concurring in the judgment), *cert. denied,* —— U.S. ——, 111

S.Ct. 384, 112 L.Ed.2d 395 (1990), the strength of the historical tradition of discrimination against homosexuals documented by the Supreme Court in *Bowers,* while supporting the denial of the due process claim in that case, in fact supports the view that governmental discrimination on the basis of sexual orientation may represent a violation of equal protection considerations.

> It is perfectly consistent to say that homosexual sodomy is not a practice so deeply rooted in our traditions as to merit due process protection, and at the same time to say, for example, that because homosexuals have historically been subject to invidious discrimination, laws which burden homosexuals as a class should be subjected to heightened scrutiny under the equal protection clause. Indeed, the two propositions may be considered complementary: In all probability, homosexuality is not considered a deeply-rooted part of our traditions *precisely because* homosexuals have historically been subjected to invidious discrimination.

*Id.* at 719 (emphasis in original).

The distinction between conduct and orientation may be seen in the cases decided by lower federal courts which have discussed the appropriate standard for review of governmental discrimination against homosexual activity. Decisions which have refused to impose a heightened scrutiny analysis have done so with an emphasis that persons engaging in homosexual *conduct* do not constitute a suspect class. *See High Tech Gays v. Defense Industr. Sec. Clearance Office,* 895 F.2d 563 (9th Cir. 1990) (challenged regulations "all relate to conduct" rather than orientation); *Padula v. Webster,* 822 F.2d 97 (D.C.Cir.1987) (homosexual orientation not resulting in homosexual conduct not in issue); *National Gay Task Force v. Board of Education,* 729 F.2d 1270 (10th Cir.1984), *aff'd by an equally divided court,* 470 U.S. 903, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985) (teachers could be fired for "engaging in an indiscreet public act of oral or anal intercourse"); *Singer v. United States Civil Service Com'n,* 530 F.2d 247 (9th Cir.

1976).[2]

*Bowers,* however, provides no bar to the use of heightened scrutiny when analyzing governmental discrimination based upon sexual orientation. However, in identifying which governmental classifications require heightened scrutiny analysis, the Supreme Court, in a series of cases, has identified several considerations which are relevant. The discrimination must be invidious and unjustifiable, that is, discrimination based upon an obvious, immutable, or distinguishing trait which frequently bears no relation to ability to perform or contribute to society. A second factor is whether the class historically has suffered from purposeful discrimination. Third and finally, the class must lack the political power necessary to obtain protection from the political branches of government. *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440–41, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985); *Plyler v. Doe,* 457 U.S. 202, 216 n. 14, 219–23, 102 S.Ct. 2382, 2394 n. 14, 2395–97, 72 L.Ed.2d 786 (1982) *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976); *San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1293, 36 L.Ed.2d 16 (1973); *Frontiero v. Richardson,* 411 U.S. 677, 684–87, 93 S.Ct. 1764, 1769–70, 36 L.Ed.2d 583 (1973).

**2.** One Circuit has abandoned explicitly the distinction between orientation and conduct which has been stressed in other cases. In *Ben-Shalom v. Marsh,* 881 F.2d 454, 464 (7th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990), the Seventh Circuit held, without any evidence in the case before it, and without citation to any authority of any kind, that the plaintiff's admitted lesbian orientation compelled the "reasonable inference" that she "has in the past and is likely to again engage in such conduct."

**3.** In *High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563, 573 (9th Cir.1990), the Ninth Circuit, without citation to any evidence in the record or to a single medical authority, announced that: "[h]omosexuality is not an immutable characteristic; it is behavioral and hence is fundamentally different from traits such as race, gender, or alienage, which define already existing suspect and quasi-suspect classes." In *Woodward v. United States,* 871 F.2d 1068, 1076 (Fed.Cir.1989), the Federal Circuit also opined that "[m]embers of recognized suspect or quasi-suspect classes, e.g., blacks or

In denying heightened scrutiny to discrimination against homosexuals, two circuit courts have found that homosexuality was not an immutable characteristic.[3] In both cases, the findings were made without the benefit of any supporting authority, and were barren of any cited scientific or medical authority which would lend support to such conclusions. Nor did the courts cite in evidence in the records before them, instead simply intoning that homosexual orientation was not immutable.

This, of course, is hardly surprising, in view of the overwhelming weight of currently available scientific information. According to that information, sexual orientation (whether homosexual or heterosexual) is generally not subject to conscious change.[4] Sexual orientation becomes fixed during early childhood, "it is not a matter of conscious or controllable choice." *High Tech Gays v. Defense Ind. Clearance Off.,* 909 F.2d 375 (9th Cir.1990) (en banc) (Canby, J., dissenting). Judge Norris has put the issue in terms the ordinary person (whether heterosexual or homosexual) can appreciate. If the government began to discriminate against heterosexuals, how many heterosexuals "would find it easy not only to abstain from heterosexual activity but also shift the object of their desires to persons of the same sex?" *Watkins v. United States Army,* 875 F.2d 699, 726

women, exhibit immutable characteristics, whereas homosexuality is primarily behavioral in character." As with the Ninth Circuit in *High Tech Gays,* the court offered not the slightest support or authority for the position that homosexuality is a mutable characteristic.

**4.** *See* Coleman, "Changing Approaches to the Treatment of Homosexuality," in *Homosexuality: Social, Psychological, and Biological Issues,* 81–88 (W. Paul, J. Weinrich, J. Bonsiorek & M. Hotvedt eds. 1982); A. Bell, M. Weinberg, & F. Hammersmith, *Sexual Preference—Its Development in Men and Women,* 166–67, 211, 222 (1981); McConaghy, *Is a Homosexual Orientation Irreversible?,* 129 Brit. J. Psychiatry, 556, 563 (1976); Acosta, *Etiology and Treatment of Homosexuality,* 4 Arch. Sexual Behavior, 9, 23–24 (1975); C. Tripp, *The Homosexual Matrix,* (1975); Ross & Stalstrom, *Exorcism as Psychiatric Treatment: A Homosexual Case Study,* 8 Arch. Sexual Behavior, 379 (1979). Additional authorities are cited in Note, *An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality,* 57 S.Cal.L.Rev. 797, 819–21.

(9th Cir.1989) (en banc) (Norris, J., concurring).

Aside from the available scientific evidence, which strongly supports the view that sexual orientation is not easily mutable, complete and absolute immutability simply is not a prerequisite for suspect classification.[5] Race, gender, alienage, and illegitimacy can all be changed, yet discrimination on the basis of any of these categories compels heightened scrutiny by the courts. Aliens may obtain citizenship, gender may be altered by surgery, lighter-skinned blacks may pass as white. Discrimination on the basis of race would not become permissible merely because a future scientific advance permits the change in skin pigmentation.

The consideration of the mutability of a personal trait which is the subject of governmental discrimination serves a more general purpose, indicating the existence of particularly heinous and reprehensible forms of discrimination. While traits such as race, gender, or sexual orientation may be altered or concealed, that change can only occur at a prohibitive cost to the average individual. Immutability therefore defines traits which are central, defining traits of personhood, which may be altered only at the expense of significant damage to the individual's sense of self. See L. Tribe, *American Constitutional Law* § 16–33 at 1616 (1988) (sexual orientation, whether homosexual or heterosexual, is central to the personality of the individual); Note, *The Constitutional Status of Sexual Orientation: Homosexuality as a Suspect Classification*, 98 Harv.L.Rev. 1285, 1303 (1985); *Watkins v. United States Army*, 875 F.2d at 726 (sexual orientation serves as "a central aspect of individual and group identity").

In this context, classification on the basis of sexual orientation fulfills the concern that the identifying trait of the class be immutable. Sexual orientation is a trait which is not subject to voluntary control or change. More importantly, to discriminate against individuals who accept their given sexual orientation and refuse to alter that orientation to conform to societal norms does significant violence to a central and defining character of those individuals.

Discrimination on the basis of sexual orientation is invidious. In addition to the immutable nature of the trait, homosexual individuals have been and are the subject of incorrect stereotyping. See *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 729–30, 102 S.Ct. 3331, 3338–39, 73 L.Ed.2d 1090 (1982) (invalidating discrimination based on stereotype of what constitutes acceptable female work). Homosexual orientation "implies no impairment in judgment, stability, reliability or general social or vocational capabilities." Resolution of the American Psychological Association (Jan. 1985). Nor does homosexual orientation alone impair job performance, including the job of teaching in public schools. *Acanfora v. Board of Educ.*, 359 F.Supp. at 851. See also *Norton v. Macy*, 417 F.2d 1161 (D.C.Cir.1969). As a class-defining trait, sexual orientation "bears no relation to ability to perform or contribute to society." *Frontiero v. Richardson*, 411 U.S. at 686, 93 S.Ct. at 1770.

Yet homosexuals remain the subject of significant and virulent stereotyping in modern society. Homosexuals are believed to be effeminate (if gay) or masculine (if lesbian), they are believed to proselytize children to homosexuality or indeed seek out children to molest, they are believed to be mentally ill; stereotypes which are all demonstrably false. See Note, *An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications based on Homosexuality*, 57 S.Cal.L. Rev. 797, 821–24 (1984). In truth, the sexual orientation of the vast majority of homosexuals is not identifiable on the basis of mannerism alone. Marmor, "Clinical Aspects of Male Homosexuality," in *Homosexual Behavior: A Modern Reappraisal*, 267 (Marmor ed. 1980). Homosexuals are no more likely to molest children than are heterosexuals. *Id.*, at 271; State of Ore-

---

5. In listing the factors relevant to the determination that a governmental classification is suspect, the Supreme Court has omitted citing immutability as a requirement on several occasions. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440–41, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976); *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1293, 36 L.Ed.2d 16 (1973).

gon Dept. of Human Resources, *Final Report of the Task Force on Sexual Preference,* 21 (1978). Homosexuals are not mentally ill. "[T]he National Association for Mental Health, the American Psychiatric Association, and the Surgeon General now agree that homosexuality, in and of itself, is not a mental illness." 57 S.Cal.L.Rev. at 824.

In addition to the invidiousness of discrimination presently faced by members of a classification—the presence of inaccurate stereotyping, the lack of any connection between the classification and the ability of the individual to perform in society—the Supreme Court has also focused on the historical background of that discrimination, to determine whether the class has suffered a history of purposeful discrimination. Homosexuals in the United States have historically been subjected to discrimination both pervasive in its scope and intense in its impact. *Rowland v. Mad River Local School Dist.,* 470 U.S. 1009, 1014, 105 S.Ct. 1373, 1376, 84 L.Ed.2d 392 (1985) (Brennan, J., dissenting from denial of cert.) (homosexuals have been the historical object of "pernicious and sustained hostility"). *See also* 98 Harv.L.Rev. at 1302 (stigmatization of homosexuals has "persisted throughout history, across cultures, and in the United States"); 57 S.Cal.L.Rev. at 824–25 (homosexuals "have historically faced pervasive discrimination" in America). Widespread discrimination against homosexuals exists in both public and private employment. *Developments in the Law—Sexual Orientation and the Law,* 102 Harv.L.Rev. 1508, 1554, 1575 (1989). Homosexuals must also face discrimination in many other facets of modern life. *Id.,* at 1671. In finding jobs, securing housing, in nearly every aspect of social existence, discrimination on the basis of sexual orientation has been a persistent facet of life in America. The prejudice against homosexuals is "so severe and pervasive that homosexuals are often forced to hide their identities as homosexuals." 31 B.C.L.Rev. at 377.

Unfortunately, the deep-seated societal prejudice against homosexuals also evidences itself in widespread violence against homosexuals. One study has found that homosexuals probably face victimization more frequently than any other minority group. P. Flinn & T. McNeil, *The Response of the Criminal Justice System to Bias Crime: An Exploratory Review,* at 2 (1987). Law enforcement officials report that violence against homosexuals is both significant, and, perhaps due to the AIDS epidemic, increasing. *See* Swisher & Masters, *Police, Gay Activists See Rise in Assaults on Homosexuals,* Washington Post, Sept. 17, 1989 at A1; Mannery, *Anti–Gay Acts in U.S. Widespread,* Chicago Tribune, June 8, 1990 at 20; Schoolman, *Bias Crimes Against Gays Increasing in Major U.S. Cities,* Reuters, Mar. 6, 1991.

A final consideration used by the Supreme Court in identifying governmental classifications which require heightened scrutiny is whether the class has traditionally been unable to protect the rights of its members through the political process. Heightened scrutiny serves to protect politically powerless minorities or groups against majoritarian abuses. Special protection is accorded the class under heightened scrutiny analysis because it is unable to secure similar protection through representative government. *See Cleburne,* 473 U.S. at 441, 105 S.Ct. at 3255; *Plyler,* 457 U.S. at 216 n. 14, 102 S.Ct. at 2394 n. 14; *Murgia,* 427 U.S. at 313, 96 S.Ct. at 2566; *Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1293.

One circuit court, in refusing to extend heightened scrutiny to homosexuals, argued that recent legislation in several states indicates that homosexuals are not politically powerless. Citing anti-discrimination provisions in three states, an executive order in New York, and a series of local ordinances, the Ninth Circuit in *High Tech Gays,* 895 F.2d at 574, announced: "Thus, homosexuals are not without political power; they have the ability to and do 'attract the attention of the lawmakers,' as evidenced by such legislation."

As an initial matter, it must be observed that this view is premised on an inaccurate, and exaggerated, view of recent state anti-discrimination legislation. The Ninth Circuit's catalogue of legislative action is taken directly from two footnotes to a recent

Harvard University analysis of homosexual rights in America in *Developments in the Law—Sexual Orientation and the Law*, 102 Harv.L.Rev. 1508, 1667 n. 49, & 1668 n. 51 (1989). The court ignored the text which accompanies this section of the Harvard study: "Unfortunately, very little legislation protects gay men and lesbians from discrimination in the private sector. No federal statute bars discrimination by private citizens or organizations on the basis of sexual orientation. Nor do the states provide such protection: only Wisconsin has a comprehensive statute barring such discrimination in employment." *Id.*, at 1667. The Harvard study concludes that discrimination against homosexuals is pervasive, and recent changes in the law too inadequate to provide adequate protection. Unless more is done, the study found, "gay men and lesbians will remain unable to conduct their lives free from discrimination." *Id.*, at 1671.

The Ninth Circuit's position in *High Tech Gays* not only exaggerates the significance of recent anti-discrimination efforts, it suffers from a more fundamental error. It mistakenly assumes that scattered, piecemeal successes in local legislation are proof of political power, and hence an invalidation of the use of heightened scrutiny in governmental classifications based on sexual orientation. The standard implicitly adopted by the Ninth Circuit would disqualify every group from suspect or quasi-suspect status. Blacks, women, aliens, or any group which has obtained some form of legislative protection would forfeit the benefits of heightened scrutiny. As Judge Canby has properly observed, the Ninth Circuit's argument in *High Tech Gays* is not consistent with the Supreme Court's treatment of other minorities. The existence of isolated, local anti-discrimination successes

> is clearly insufficient to deprive homosexuals of the status of a suspect classification. Compare the situation with that of blacks, who clearly constitute a suspect category for equal protection purposes. Blacks are protected by three federal constitutional amendments, major federal Civil Rights Acts of 1866, 1870, 1871, 1875 (ill-fated though it was),

1957, 1960, 1964, 1965, and 1968, as well as by antidiscrimination laws in 48 of the states. By that comparison, and by absolute standards as well, homosexuals are politically powerless.

*High Tech Gays v. Defense Ind. Clearance Off.*, 909 F.2d at 378 (Canby, J., dissenting from denial of rehearing en banc).

In reality, homosexuals face severe limitations on their ability to protect their interest by means of the political process. As Justice Brennan has observed, "[b]ecause of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena." *Rowland v. Mad River Local School Dist.*, 470 U.S. at 1014, 105 S.Ct. at 1376. *See also High Tech Gays*, 909 F.2d at 378 (homosexuals are regarded as "political pariahs" by the major political parties); and *Watkins*, 875 F.2d at 727 (Norris, J., concurring in the judgment) (homosexuals face structural barriers rendering "effective political participation unlikely if not impossible").

There are several factors which limit effective political action by homosexuals. Due to the harsh penalties imposed by society on persons identified as homosexual, many homosexual persons conceal their sexual orientation. Silence, however, has its cost. It may allow a given individual to escape from the discrimination, abuse, and even violence which is often directed at homosexuals, but it ensures that homosexuals as a group are unheard politically. Moreover, the prejudice that compels many homosexuals to refrain from open political activity also limits access to political power in other ways. By diminishing contact between the heterosexual majority and avowed homosexuals, the majority loses any perspective on concerns in the homosexual community and is deprived of the resulting sensitivity to those concerns. Politicians seeking to limit the impact of anti-homosexual prejudices through legislation are themselves the target of prejudice. 57 S.Cal.L.Rev. at 825–27.

There is, the court believes, no way to analyze the present issue under the guidelines set down by the Supreme Court and

reach any conclusion other than that discrimination based on sexual orientation is inherently suspect. Sexual orientation is not a matter of choice; it is a central and defining aspect of the personality of every individual. Homosexuals have been and remain the subject of invidious discrimination. No other identifiable minority group faces the dilemma dealt with every day by the homosexual community—the combination of active and virulent prejudice with the lack of an effective political voice. Only by abandoning the established tests of suspectness, and retreating to some other formulation is it possible to achieve some other result. This court cannot join in such a retreat. Accordingly, the court finds that a governmental classification based on an individual's sexual orientation is inherently suspect.

*Rational Basis*

■ For reasons discussed below, the court finds that it is also necessary to discuss the present case in the context of the most permissive standard applicable in equal protection analysis, the rational basis standard. That is, even assuming there is no suspect class here, the question remains whether there is any rational basis for the consideration of sexual orientation in public employment decision making.

There are special circumstances in which a rational basis for such discrimination has been found. In cases which have refused to apply heightened scrutiny to the defendant's conduct in discriminating against homosexual conduct, a rational basis for the conduct has been found in the need to maintain morale and discipline in the armed forces, *Ben–Shalom v. Marsh,* 881 F.2d 454 (7th Cir.1989); *Woodward v. United States,* 871 F.2d 1068, 1076 (Fed.Cir.1989); *Beller v. Middendorf,* 632 F.2d 788 (9th Cir.1980); the requirement for avoiding illegality among law enforcement personnel, *Padula v. Webster,* 822 F.2d 97 (D.C.Cir.1987); and the need to limit the exposure of persons in positions with access to sensitive information to blackmail, *High Tech Gays v. Defense Industr. Security Clearance Off.,* 895 F.2d at 575–78 (Department of Defense personnel with secret and top secret security clearances); *Padula,* 822 F.2d at 97 (FBI agent).

Of course, none of those considerations are present here. There is no threat to discipline, no threat of blackmail. Nor, it must be noted, does the defendant even attempt to offer a rational basis for his alleged discrimination on the basis of sexual orientation.

The defendant's brief, to the extent that it makes any attempt to identify a rational basis for his actions, merely reasserts his denial of any consideration of Jantz's alleged "homosexual tendencies," and contends that the only considerations which affected his decision were legitimate employment factors, such as coaching experience. The problem with this is that it wholly ignores the standards of summary judgment which require the court to assume the truth of Jantz's version of the facts: that Muci refused to hire Jantz because of his perceived homosexual orientation.

This approach was maintained by the defendant during the hearing on the present motion. Despite repeated invitations by the court, the defendant modestly declined to identify any rational basis for a decision not to hire predicated on Jantz's alleged "homosexual tendencies." The defendant instead used each opportunity extended by the court to retreat into his factual argument, averring that the decision not to hire Jantz had nothing to do with his perceived sexual orientation, and was solely based upon Silverthorne's superior coaching experience.

Assuming, however, that the plaintiff's factual contentions are correct and that the true reason for the refusal to accept Jantz for the teaching position was Muci's perception of Jantz's "homosexual tendencies," the defendant offers not one word to support the action. He makes no attempt to defend the consideration of perceived sexual orientation in determining whether to employ an applicant for a public school teaching position. Nor, the court believes, is there any possible rational basis for such discrimination in this day and age.

Homosexual orientation alone does not impair job performance, including the job of teaching public schools. *Acanfora v. Board of Educ.,* 359 F.Supp. at 851. *See also Norton v. Macy,* 417 F.2d 1161. In *Swift v. United States,* 649 F.Supp. 596

(D.D.C.1986), the plaintiff was a stenographer whose job transcribing presidential speeches and press conferences was terminated when the government revoked his White House security clearance. The government asserted the plaintiff was a "national security risk" and barred him from access to the White House. The district court denied the government's motion to dismiss, finding that the arbitrary discrimination on the basis of sexual orientation would violate the plaintiff's right to equal protection, even without the use of heightened scrutiny:

> Homosexual conduct may not be protected under the right of privacy, and homosexuals may not qualify as a suspect class. Nonetheless, the government may not discriminate against homosexuals for the sake of discrimination, or for no reason at all.

649 F.Supp. at 602.

The court accordingly concludes that the refusal to hire the plaintiff on the basis of his perceived sexual orientation was the result of an action by the defendant which was arbitrary and capricious in nature.

### Qualified Immunity

■ A key point in the defendant's motion for summary judgment, and almost the exclusive point made in the defendant's reply, is that even if there was some wrongful discrimination, the defendant is nonetheless qualifiedly immune. Under the doctrine of qualified immunity, governmental officials performing discretionary functions are shielded from civil damage actions insofar as their conduct does not violate clearly established statutory or constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity exists unless the plaintiff can demonstrate that the contours of the right allegedly violated by the defendant were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In response to a claim of qualified immunity, the plaintiff must demonstrate by facts or by allegation both that the defendant violated the law and that the law was clearly established at the time of the violation. *Snell v. Tunnell,* 920 F.2d 673, 696 (10th Cir.1990); *Pueblo Neighborhood Health Ctrs. v. Losavio,* 847 F.2d 642, 646 (10th Cir.1988).

The defense is not available, however, for discrimination which is purely arbitrary and without any rational basis. As the Tenth Circuit has observed, "when a plaintiff can point to specific facts of defendant's improper motivation, qualified immunity may be inappropriate due to a 'conflict sufficiently material to defendant['s] claim of immunity to require [him] to stand trial.'" *Snell,* 920 F.2d at 696–97 (quoting *DeVargas v. Mason & Hanger–Silas Mason Co.,* 844 F.2d 714, 719 (10th Cir.1988) (other citations omitted).

The defendant's argument with regard to qualified immunity is similar to his discussion (or rather lack thereof) relating to rational basis: he simply argues that he made a good faith professional decision which was not affected by even the slightest consideration of Jantz's alleged homosexuality. But again, the question for the court is whether, assuming Muci's real reason for not hiring Jantz was because of his "homosexual tendencies," Muci is entitled to any qualified immunity defense.

The court finds the answer is no. Certainly when the decision not to hire Jantz was made, homosexual orientation was not established as a suspect class. Muci's actions cannot therefore be tested against whether they were necessary to achieve a compelling governmental objective. Despite the court's conclusion above that discrimination on the basis of sexual orientation is inherently suspect, that determination cannot support the plaintiff's claim in the present case. At the time of the determination not to hire Jantz, the suspect nature of the classification was not clearly established.

But it had by that time been established, as the district court recognized in *Swift,* that the government cannot "discriminate for the sake of discrimination." Qualified immunity is no defense where the action of the defendant was not in good faith, was undertaken arbitrarily and without any rational motivation, and motivated instead by

a visceral, unreasoning prejudice against homosexuals. *See Swift,* 649 F.Supp. at 602. The present case provides no indication of any justification for the defendant's determination to discriminate on the basis of sexual orientation, nor, as the court has noted earlier, has the defendant attempted to supply one. The defendant has not only failed, but has indeed actively avoided attempting to articulate any rational basis for such a decision. Accepting as true the evidence offered by the plaintiff, as the court must under the relevant standards of review, the defendant acted arbitrarily, without any rational purpose, based upon personal prejudices against homosexuals. Under these circumstances, the defendant is not entitled to the defense of qualified immunity.

There are a few other matters present in the case which deserve some brief mention here. The defendant argues, without any great forcefulness, that the plaintiff's constitutional claims should be dismissed since the rights implicated are not stated with precision and clarity. The court finds this argument is without merit. The plaintiff's equal protection claim is stated clearly enough for any reasonable person to understand the nature and context of the grievance asserted and the nature of the right implicated. And certainly, the defendant has no problem in apprehending the nature of the plaintiff's claim and proceeds to discuss the arguments relating to the plaintiff's equal protection claim in detail elsewhere in his briefs to the court.

The defendant also argues that the plaintiff's claims against him in his official capacity should be dismissed. The defendant argues that he did not have decision-making authority in job hiring, and therefore is not subject to any liability for actions in his official capacity pursuant to *Jett v. Dallas Indep. School Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).[6] The defendant's argument fails in its factual premise. It is correct that the district personnel office does have some input in the hiring process, and yes, the applicants for a job must first meet district-created job qualifications. The principal's discretion in hiring is not unfettered.

Nonetheless, the facts indicate that the decision by the principal is given great weight, and in virtually all circumstances is normally decisive. Ultimate hiring decisions rarely conflict with the decision of the school principal. More importantly, and aside from considerations relating to the district's hiring policies in general, there is no evidence in the present case that any other officer or agent of the school district participated in any way in the specific decision to hire Silverthorne and not to hire Jantz. The only person demonstrated to have been involved in that decision is the defendant Muci. That failure to interfere with the decision of the principal is wholly consistent with the effective, established policy of the district. The argument that Muci had little to do with the decision not to hire Jantz cannot be accepted in light of the evidence currently before the court and the relevant standards to be used in resolving the defendant's motion for summary judgment. The plaintiff's equal protection claims against Muci, in both his individual and his official capacities, may proceed.

Finally, the plaintiff also advances claims for invasion of constitutional rights to privacy and freedom of association. Most of the arguments advanced by the plaintiff in relation to these claims substantially duplicate those in the plaintiff's equal protection claim. The plaintiff fails to adequately articulate the nature of the assert-

---

**6.** During the hearing of the present matter, the defendant also stressed the relevance of *Ware v. Unified School Dist. No. 492,* 902 F.2d 815 (10th Cir.1990). In *Ware,* the Tenth Circuit discussed the circumstances under which a school board might be held liable for actions taken by a subordinate official. Of course, the impact of the defendant's argument is limited to the plaintiff's claim against Muci in his *official* capacity; even if the defendant were correct, it would not eliminate the plaintiff's claim against Muci in his individual capacity. Here, the plaintiff has brought his claim only against the school official, not the school board. The secondary or derivative liability of the school board is not in issue. The *Jett* standards used to determine "the responsibility of the school district for the actions of [a p]rincipal" are relevant only to the action against Muci in his official capacity. 491 U.S. at 739, 109 S.Ct. at 2724, 105 L.Ed.2d at 628. As noted above, the plaintiff has demonstrated that the defendant is the agent responsible for the determination not to hire.

ed privacy and free association claims, and accordingly summary judgment will issue against the same.

IT IS ACCORDINGLY ORDERED this 29th day of March, 1991, that the defendant's motion for summary judgment (Dkt. No. 21), is granted as it relates to the plaintiff's privacy and free association claims; in all other respects, the motion is hereby denied.

### MEMORANDUM ORDER

Defendant Cleofas Muci has moved for a reconsideration of the court's memorandum and order of March 29, 1991. The arguments made by the defendant in support of this motion are identical to those advanced in support of his original motion for summary judgment. They carry no greater weight now. Accordingly, the defendant's motion for reconsideration is hereby denied.

The defendant has also moved the court to certify the case as appropriate for interlocutory appeal under 28 U.S.C. § 1292(b). Of course, the denial of a defendant's motion for summary judgment asserting a defense of qualified immunity is in any event immediately appealable under 28 U.S.C. § 1291. *Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 644 (10th Cir.1988). However, in order to expedite the fair and complete resolution of the issues presented by the defendant's motion for summary·judgment, the court finds appropriate an interlocutory appeal of the March 29 order. An interlocutory appeal would materially advance several controlling questions of law, concerning which there is a substantial disparity of opinion.

IT IS ACCORDINGLY ORDERED this 29 day of May, 1991, that the defendant's motion to reconsider and/or amend (Dkt. No. 32) is hereby denied. The court finds appropriate the taking of an interlocutory appeal from its March 29, 1991 order. Upon the taking of such an appeal, all proceedings in the district court shall be stayed.